STATE

v.

**Rudolph E. SCIARRA.**

No. 81–503–C.A.

Supreme Court of Rhode Island.

Aug. 3, 1982.

Dennis J. Roberts II, Atty. Gen., David H. Leach, Asst. Atty. Gen., for plaintiff.

Bevilacqua, DeSimone & Gosz, Joseph A. Bevilacqua, Jr., Providence, Griffin & Higgins, Kirk Y. Griffin, Boston, Mass., for defendant.

## OPINION

MURRAY, Justice.

On December 12, 1980, a Providence County Grand Jury indicted Rudolph Earl Sciarra (defendant), Nicholas A. Palmigiano (Palmigiano), and Raymond L. S. Patriarca (Patriarca). The indictment charged Palmigiano with the murder of Raymond Curcio (Curcio) on February 19, 1965. The indictment also charged the defendant and Patriarca with being accessories before the fact to the murder of Curcio.

Of the three individuals named in the indictment, only the case against defendant has gone to trial. Palmigiano pleaded guilty to the count of murder and was given a life sentence retroactive to April 10, 1969, which was to run concurrently with another life sentence he was serving. The case against Patriarca was severed from the case against defendant and has been continued indefinitely because of various health problems experienced by Patriarca. On June 8, 1981, defendant's case proceeded to trial before a justice of the Superior Court sitting with a jury. The jury found defendant guilty as charged, and the trial justice sentenced him to the mandatory life imprisonment. The defendant has been held without bail since January 8, 1981, the date of his arraignment, and he remains incarcerated while we consider his appeal from the judgment of conviction.

After the appeal was docketed, a pre-briefing conference was held with a justice of this court. Thereafter, on February 12, 1982, an order was entered directing the state:

> " * * * to *show cause* why the judgment of conviction should not be vacated and a new trial granted because of the trial justice's alleged error in refusing to allow Dr. Kenneth Russell to testify in behalf of the defense."

On March 3, 1982, a hearing was held on such show cause order before four members of this court. Subsequent to the hearing, we filed another order. This order stated that the state had shown cause at the initial hearing and that the case required more extensive briefing and argument. We also directed the parties to address in their briefs the following two issues:

> "(a) Whether the trial justice committed reversible error in excluding the proffered testimony of the expert witness, Dr. Kenneth Russell, in light of Rule 16 of the Superior Court Rules of Criminal Procedure, and in further light of the defendant's right to present a defense.
>
> "(b) Whether the trial justice committed reversible error in responding to an inquiry submitted by the jury after deliberations had begun without affording counsel an opportunity to be heard prior to the giving of said response."

The issues were argued orally before the court on April 12, 1982. Although the consideration of the first issue is sufficient to dispose of the case, we are of the opinion that it is beneficial to the administration of justice in this state that we address the second issue as well. Initially, we set forth a basic factual background for the case; additional facts necessary to the discussion of the two issues raised will be presented in the resolution of such issues.

The facts relating to the murder of Curcio are extracted in essence from the testi-

mony of Palmigiano. On the morning of February 19, 1965, Palmigiano was having breakfast in a Providence restaurant when defendant entered the restaurant and approached him. According to Palmigiano, defendant told Palmigiano that "the 'old man' wanted to see [both of them]." Palmigiano knew the "old man" to be Patriarca. In an alleyway next to Patriarca's place of business and a short distance from the restaurant, a meeting of the three men was held. Richard Callei (Callei), since deceased, was also present at the meeting. Palmigiano testified that at the meeting Patriarca ordered him to kill Curcio "right away" and directed that Callei set Curcio up for the kill. According to Palmigiano, defendant offered to supply the weapons necessary for the mission.

After the meeting, Palmigiano returned home and requested that his wife leave for the day. While Palmigiano was at his apartment, between 11:00 a. m. and 11:30 a. m., defendant delivered a brown paper bag containing two weapons: a .38 caliber revolver and a .32 caliber automatic. The defendant advised that the .38 was for the use of Callei. The defendant never left his car and the exchange took place in front of the Palmigiano residence. After defendant had left the area, Palmigiano returned to his apartment and began to clean the guns and bullets in an effort to ensure that no fingerprints remained on them. In his testimony, Palmigiano claimed that while cleaning the guns he found them to be fully loaded.

Subsequently, at 2 p. m., Palmigiano again descended the stairs of his third-floor apartment; this time Callei was waiting in his car. Palmigiano got into Callei's car and the two proceeded to an area near an abandoned housing project where the two would take Curcio later that night to his death. The pair also decided on a location where Callei's car would be parked later that evening for use as a getaway vehicle. The two then returned to Palmigiano's house where he allegedly gave Callei the .38 caliber revolver supplied by defendant. He then got into his car and drove to the site where the Callei vehicle was to be left.

Callei had parked his car; he then got into Palmigiano's car. Palmigiano drove to Callei's mother-in-law's house where Callei was dropped off. Palmigiano proceeded home and waited for Callei's return.

At approximately 8:15 p. m., after certain initial difficulties, Callei returned to the Palmigiano home sitting in the passenger's seat of a car driven by Curcio. Palmigiano, who had been waiting in the cold, sat in the rear and positioned himself in the middle of the seat. Initially, Callei remarked that "this [had] better be a good score." Because Curcio had been informed that the trio was to commit a burglary, Callei's statement was made to put Curcio at ease. As the car approached the earlier-chosen site, Palmigiano slid behind Curcio and fired two shots into the back of his head. Callei, using the .38, fired three shots into the victim. As he left the car, Palmigiano fired another bullet at Curcio through an open window on the passenger's side of the car.

The pair proceeded to Callei's car and then drove to Palmigiano's apartment. After a wash of his hands with vinegar and a check for bloodstains, Callei departed from the apartment. The gloves he had worn and the gun he had used were left behind so that Palmigiano could dispose of them. After Palmigiano had dropped Callei's gloves into a wastepaper basket, he descended the stairs of his apartment with the two pistols in his possession. According to Palmigiano's testimony, he got into his car and drove to Canada Pond where he dropped the pistols and his gloves into the water.

The following morning, February 20, 1965, Curcio's body was found in the automobile by the police. No one was charged with the crime until December 12, 1980. The guns allegedly used in the crime were not recovered until October of 1980.

I

Initially, we consider the issue of whether the trial justice committed reversible error in excluding the testimony of Dr. Kenneth Russell (Dr. Russell), a Professor of Metal-

lurgy at the Massachusetts Institute of Technology. The trial justice refused to allow the proffered testimony because of defendant's failure to comply with Rule 16 of the Superior Court Rules of Criminal Procedure.

Rule 16 in pertinent part provides:
" * * *

"(b) Discovery by the State. A defendant who seeks any discovery under subdivision (a) of this rule shall permit the State, upon receipt of written request, to inspect or listen to and copy or photograph any of the following items within the possession, custody or control of the defendant or his attorney:
" * * *

"(2) all results or reports in writing, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case and prepared by a person whom the defendant intends to call as a witness at the trial and, subject to an appropriate protective order under paragraph (f), any tangible objects still in existence that were the subject of such tests or experiments;

"(3) a written list of the names and addresses of all persons other than the defendant whom the defendant expects to call as witnesses at the trial in the event the State presents a prima facie case;

"(4) as to those persons other than the defendant whom the defendant expects to call as witnesses at the trial, all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such statement of a witness is in the possession of the defendant, a summary of the testimony such person is expected to give at the trial.
" * * *

"(h) Continuing Duty to Disclose. If, subsequent to compliance with a request for discovery or with an order issued pursuant to this rule, and prior to or during

trial, a party discovers additional material previously requested which is subject to discovery or inspection under this rule, he shall promptly notify the other party of the existence thereof.

"(i) Failure to Comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to provide the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material which or testimony of a witness whose identity or statement were not disclosed, or it may enter such other order as it deems appropriate."

The record reveals that Dr. Russell would have testified that in his professional opinion the .38 caliber weapon had been immersed in water for a period of between ten and twenty years, whereas the .32 caliber weapon had been immersed in water for a period of between six months and two years.[1] He would have concluded that the two weapons had not been subjected to identical corrosion conditions for the same length of time. In excluding Dr. Russell's testimony, the trial justice relied upon the fact that the state had rested prior to being made aware of the contents of his testimony. After a careful review of the record, we are of the opinion that the trial justice erred in excluding this evidence.

The imposition of any of the sanctions listed in Rule 16(i) is a matter addressed to the sound discretion of the trial justice. *State v. Darcy*, R.I., 442 A.2d 900, 902 (1982); *State v. Silva*, 118 R.I. 408, 411, 374 A.2d 106, 108 (1977). In *Silva*, we held that a trial justice had abused his discretion by imposing the drastic sanction of excluding testimony for a defendant's technical noncompliance with Rule 16. *Id.* at 412, 374 A.2d at 109. When a trial justice exercises his discretion, he is required to consider what is "right and equitable under all of

---

1. In his proffer to the trial court, defense counsel stated that in Dr. Russell's opinion the .32 had been in the water between eighteen

months and five years. Doctor Russell's later-supplied report sets the time frame for immersion at between six months and two years.

the circumstances and the law." *State v. Allan*, R.I., 433 A.2d 222, 225 (1981).

In the present case, we find that defendant has not done anything which would warrant the severe sanction of exclusion. At the trial court level and on appeal, counsel for defendant has made clear Dr. Russell's need to know the specific environmental conditions that existed at the location where the weapons were found. The state's answer to defendant's request for discovery was clearly inadequate for Dr. Russell's purposes. The requisite information was not made available to defendant until the navy divers had testified on the 11th and 12th of June 1981. We are not in agreement with the trial justice's observation that "one look at Canada Pond" would lead to the same conclusion about the pond's bottom as that testified to by the navy divers. As trial counsel immediately replied to the trial justice's remark, and we concur therein, it would make a difference for Dr. Russell's tests whether the guns had been found in silt or resting upon the rubbish that evidently, according to testimony, covers the bottom of the pond.

That defendant's expert needed to know the specific environmental conditions that existed in the location where the guns had been found, rather than the condition of the pond bottom in general, is evidenced by a report dated February 9, 1981, and sent by the Federal Bureau of Investigation (FBI) to the Providence Police Department. The report stated that the FBI could not reach a conclusion "regarding the duration of exposure to the corrosive conditions" because the state had not supplied information regarding the environmental conditions the guns had been subjected to while they rested in Canada Pond. Doctor Russell, through the use of divers employed by defendant, was able to ascertain the general conditions existing at the bottom of Canada Pond. He was not able to determine the specific conditions to which the guns had

been exposed because the guns had been removed months before defendant's divers searched the bottom of the pond. Doctor Russell had to wait for the navy divers to testify before learning of the specific conditions to which the guns had been subjected.[2]

In addition, once the relevant information was provided by the navy divers, defendant used due diligence in getting the information to Dr. Russell and in advising the state and trial court of his conclusions. After each diver had testified, the appropriate information was telephoned to Dr. Russell by defense counsel. On the Saturday afternoon of June 13, 1981, the day after the second navy diver had testified, Dr. Russell orally informed defense counsel of his conclusions concerning the guns. The following Monday morning, defense counsel relayed the information to the state and trial court. In addition, on the very next day, the day Dr. Russell's report was finally completed, it was made available to the trial court and the state.

■ Doctor Russell's testimony, if admitted into evidence and if credible, would have formed an essential element of the defense presented by defendant. Moreover, it cannot be doubted that such testimony could have had an effect upon the jury. It is fundamental to due process of law that defendant be allowed to present witnesses in his defense.[3] *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967); *State v. Pari*, R.I., 430 A.2d 429, 433 (1981).

■ In conclusion, we are of the opinion that the trial justice abused his discretion in excluding the crucial testimony of Dr. Russell.

II

The second issue concerns the trial justice's response to a note received from the jury. Not long after their deliberations had begun, the jury sent a hand-written note to

---

2. It is undisputed by the state that the navy divers were unavailable prior to the time that they were called to testify.

3. As was the case in *State v. Silva*, 118 R.I. 408, 374 A.2d 106 (1977), we do not reach the issue of whether the exclusion of the evidence violated defendant's right to compulsory process.

the trial justice. In his instructions, the trial justice had advised the jury that this was to be the required method of communication. The note reads as follows:

"How many bullets, according to Mr. Palmigiano's testimony, were there in the .32 magazine prior to the shooting when he cleaned the gun at his apartment[?]"

The trial justice, evidently interpreting the note as a request for a factual answer, failed to read back any portion of Palmigiano's testimony to the jury. The note in which the trial justice responded to the jury's request stated that "[y]ou must use your recollection of the testimony."[4] At the time of the communication between the trial justice and the jury, counsel for the state and defendant were absent from the courtroom.

On appeal, counsel for defendant has alerted this court to the significance of the objective inconsistencies in the testimony relating to the .32 caliber weapon and its bullets. Palmigiano testified that after defendant had delivered the guns, and before Callei had arrived, he had cleaned the guns with a rag. Palmigiano mentioned that the .32 caliber had a fully loaded clip. According to Palmigiano, he later fired a total of three bullets into Curcio's body with the .32 caliber. The gun, when tested by the FBI, had only two bullets in the magazine and evidently none in the chamber. The defendant's argument is that this total of five bullets (three fired and two remaining in the magazine) did not correspond with the gun's capacity of either six bullets according to the state's expert witness[5] or seven bullets according to defendant's expert. In addition, as defendant's expert had stated, a pistol of the type tested will replace a bullet in the chamber when the gun is fired. The inconsistency between the gun's capacity and Palmigiano's version of the number of bullets fired and the failure of a bullet to be lodged in the chamber

evidently formed the basis for the thrust of defendant's final argument at the trial court level: that the .32 could not have been the murder weapon.

■ In reviewing the record before us, we are of the opinion that the trial justice committed error in his response to the jury's note. The record reveals that Palmigiano was the second witness called in a fairly lengthy trial. The importance of his testimony to the state's case is obvious. As the trial developed and as the experts in ballistics were called, Palmigiano's testimony regarding the .32 caliber weapon and the number of bullets he had fired therefrom became increasingly significant. The jury, evidently realizing such significance, made its request to the trial justice shortly after its deliberations had begun.

Although the note from the jury did not explicitly state that it wanted the testimony of Palmigiano read back, we are of the opinion that the trial justice should have at least inquired of the jury whether or not they wanted to hear Palmigiano's testimony. This minimal effort would have eliminated any confusion caused by the note. It is quite possible that the jury was asking for a factual answer rather than for a re-reading of Palmigiano's testimony. This court will not attempt to determine what the jury meant by the note. Quite simply, our decision is that the trial justice committed error when he failed to inquire of the jury whether they wanted Palmigiano's testimony read back.

■ We are also of the opinion that there is a procedural problem with the method in which the trial justice responded to the note from the jury. The trial justice should have allowed defense counsel an opportunity to be heard before a response was given to the note.

Rule 43 of Super.R.Crim.P. provides in pertinent part that "[t]he defendant shall

---

4. When later read into the record, the note was quoted as stating that "[y]ou must use your *own* recollection of the testimony." (Emphasis added.) We view the difference between the note and the transcript as inconsequential.

5. The state's expert from the FBI reached this overall capacity figure by adding the magazine's capacity of five bullets to the chamber's capacity of one.

be present at every stage of the trial, including the impaneling of the jury and the return of the verdict * * *." Rule 43(a) of the Federal Rules of Criminal Procedure is substantially similar. In fact, the relevant portion contains the same language: "The defendant shall be present * * * at every stage of the trial including the impaneling of the jury, and the return of the verdict * * *." In a recent case, we have specifically stated that we shall look to federal authorities for guidance in interpreting our Rule 43. *State v. LaChappelle,* R.I., 424 A.2d 1039, 1043 (1981).

The United States Supreme Court has employed the above-quoted language from Federal Rule 43(a) in finding "that [defendant's] counsel should [be] given an opportunity to be heard before the trial judge respond[s]" to a jury's request. *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1, 6 (1975). Evidently, this is "settled law" in the federal court system. *United States v. Ronder,* 639 F.2d 931, 934 (2d Cir. 1981).

The case of *State v. Souza,* R.I., 425 A.2d 893 (1981), cited by the state, does not aid the state's cause. That case involved a situation where counsel was present and able to represent the defendant's interest when the trial justice responded to the jury's request even though the defendant was not present. *Id.* 425 A.2d at 901–02. The fact that counsel was not present here puts the instant case in an entirely different light than *Souza.*

In conclusion, we are of the opinion that defense counsel should have been given an opportunity to argue for the rereading of the crucial Palmigiano testimony. The failure to grant such opportunity was error.

For the reasons stated, the defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for further proceedings.

BEVILACQUA, C. J., did not participate.