**STATE**

v.

**James GIBLIN.**

**No. 88–599–C.A.**

Supreme Court of Rhode Island.

Jan. 16, 1990.

James E. O'Neil, Atty. Gen. and Jane M. McSoley, Sp. Asst. Atty. Gen., Providence, for plaintiff.

William T. Murphy, Providence, for defendant.

OPINION

KELLEHER, Justice.

On August 26, 1986, the defendant, James Giblin, was arrested in Birmingham, Alabama, and extradited to Rhode Island where he was charged by the Pawtucket police with the murder of Francis J. Vaillencourt. Later a Superior Court jury found the defendant guilty of second-degree murder. Hereafter we shall refer to the defendant and to the deceased by their last names.

At the Superior Court trial two witnesses testified that at approximately 3 p.m. on August 23, 1986, they observed Giblin standing alongside a car in which Vaillencourt was a front-seat passenger. Giblin had a gun that was pointed inside the vehicle. One of the witnesses described the vehicle in question as a brown Hornet. Both witnesses heard the sound of yelling followed by two gunshots, and one witness heard Giblin remark, "It's all over now."

Shortly after 3 p.m. a Pawtucket detective received information relative to the location of the Hornet. When he arrived at the specified location, he observed a Hornet with a "white male" sitting in the passenger seat. The passenger was Vaillencourt, and he had been shot in the left temple. Rescue personnel responding to the scene informed the detectives that Vaillencourt's wound was fatal.

Subsequently a bag that had been taken from the trunk of Giblin's car was found in a pond at the Providence North Burial Ground. The bag contained a gun. At trial an FBI agent testified that the bullet retrieved from Vaillencourt's body had been fired from the gun used by Giblin. A warrant was issued for Giblin's arrest, and several days after its issuance the Pawtucket police department was notified that Giblin was in Alabama in the custody of the Birmingham County Sheriff's Department.

On August 29, 1986, two lieutenants from the Pawtucket police department traveled to Alabama and met Giblin, who was then being held in the Birmingham jail. They advised Giblin of his rights, and after being advised of his rights, Giblin indicated that he did not wish to give a statement and wanted to consult an attorney.

The next day Giblin, in the company of the two lieutenants, began the return trip to Rhode Island. In discussing Giblin's behavior aboard the plane, one of his escorts observed that Giblin "was constantly rambling on about his childhood and growing up in Pawtucket and friends he had from the Army days." Giblin explained to the escorts how he had traveled to Birmingham on one occasion so that he could see one of his Army buddies. Giblin also volunteered that he "took off the night of the shooting in Pawtucket."

The escorts both testified that at no time was Giblin interrogated. In fact, they reminded him on several occasions during the flight of his constitutional right to remain silent.

The trial justice denied Giblin's motion to suppress his "in-the-air" statements, stating that it was obvious that the police had not asked him any questions on the plane.

Giblin's appellate counsel has challenged his client's conviction on two grounds. The first relates to the trial justice's action when the jury asked that certain testimony be read back to it. The second issue concerns the admission of statements made by Giblin to his escorts on the return flight to Rhode Island.

■ The requested testimony was for "the testimony of both women regarding where they were and what they saw at the time the trigger of the gun was pulled." In responding to this request, the trial justice asked the jurors if they could be more specific because, in reality, they were asking for all the testimony of both witnesses to be read back in its entirety. The trial justice, however, said:

"[I]f that's what you want, we will make that available. The stenographer will read all the testimony back for you if that is what you want. Unless you can be more specific, I am going to ask you that you go back upstairs and consult with one another and let me know specifically what you are looking for. If you can be specific, fine. If you can't be, and you still want testimony, we will have it read back."

In response to the trial justice's instructions, the jurors then sought a reading of the testimony of the witness who was serving as a babysitter at the time of the shooting. The jury requested a reading of the testimony regarding what she did between the time she heard the yelling up until the time she ordered the children to return to the house and heard the shots fired. The trial justice then ordered the stenographer to read back the desired portion of the testimony, including both direct- and cross-examination. When the reading was completed the jury again retired for further deliberations.

Giblin's counsel refers us to this court's holding in *State v. Sciarra*, 448 A.2d 1215 (R.I.1982), where it was noted that a request from the jury to read back testimony should probably be honored. Here, however, the record reveals that at no point did the trial justice reject the jurors' request. Although he did ask for a more specific inquiry, he also made it perfectly clear that if they could not be precise in pinpointing the testimony they wanted to hear, all the testimony in the initial request would be read back. We cannot fault the trial justice for the manner in which he responded to the jurors' inquiry.

■ Giblin's counsel, in citing *State v. Sciarra*, relies on a fact pattern that was not before the trial justice in the case at bar.[1] The decision to read testimony rests in the sound discretion of a trial justice, and in exercising that discretion, the justice can and should take into consideration the reasonableness of the jury's request and the difficulty of complying therewith.

---

1. In *State v. Sciarra*, 448 A.2d 1215 (R.I.1982), the jury had begun its deliberations when it sent to the trial justice a hand-written note that asked, "How many bullets, according to Mr. Palmigiano's testimony, were there in the .32 magazine prior to the shooting when he cleaned the gun at his apartment[?]" The trial justice, apparently interpreting the note as a request for a factual answer, responded to the request by stating, "You must use your recollection of the testimony." At the time of the communication, counsel for the state and defense were absent from the courtroom. The trial justice was faulted by this court for his failure to inquire from the jury whether they wanted Palmigiano's testimony read back to them. *Id.* at 1220.

*United States v. Almonte*, 594 F.2d 261, 265 (1st Cir.1979).

Recently, in *State v. Burke*, 529 A.2d 621 (R.I.1987), the jury had asked for the "initial testimony" of a witness concerning a specific point of testimony. There we held that there was no error in the trial justice's decision to omit the rereading of the cross-examination of that witness that bore only on the witness's credibility. Here, it is clear that there was no error in the trial justice's suggestion to the jurors that they narrow their request. The jurors did reframe their request, and all the desired testimony was read back.

 Giblin's counsel also argues that the trial justice should have suppressed the various statements Giblin made on the return flight to Rhode Island because his escorts had failed to give him his *Miranda* warnings on that particular occasion.

Giblin was fully apprised of his rights by his escorts when he was in the Birmingham County Jail awaiting transportation to Rhode Island. At that time he invoked his right to counsel and chose not to make any statements to the police. It is clear from the record that it was Giblin himself who initiated the communications the next day on the plane, and so the issue was whether he had knowingly and intelligently waived his rights by opening the dialogue with his escorts. The undisputed testimony is that on the plane Giblin began talking about old Army buddies, his childhood, and his visit to Alabama, including the fact that he had left Rhode Island after the shooting. The escorts reminded him of his *Miranda* rights but did not fully restate those rights for him. Although it might have been better had they done so, we cannot fault the escorts' actions.

The evidence clearly indicates that there was no interrogation of Giblin by the escorts. As he began to speak, he was reminded by the escorts of his rights, and he in turn responded that he knew all about them.

Recently, in *State v. Lionberg*, 533 A.2d 1172, 1177 (R.I.1987), we pointed out the two-step process enunciated in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), for determining the admissibility of a statement given by a defendant who had earlier invoked his *Miranda* rights. First it must be asked whether the accused "initiated" the conversation. If the answer is yes, the next inquiry is whether the accused waived his right to counsel and has remained silent, " 'that is, whether the purported waiver was knowing and intelligent * * * under the totality of the circumstances, including the fact that the accused, not the police, reopened the dialogue with the authorities.' " 533 A.2d at 1177.

This is the analysis adopted by the trial justice in considering Giblin's motion to suppress. The trial justice ruled that his statements were admissible, and we subscribe to that conclusion.

The defendant's appeal is denied and dismissed. The judgment of conviction appealed from is affirmed.