STATE

v.

Donna DELLATORE.

No. 98–298–C.A.

Supreme Court of Rhode Island.

Nov. 3, 2000.

Aaron L. Weisman, Providence, Jane M. McSoley, for Plaintiff.

Kelly Monteiro, Providence, Paula Rosin, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the defendant, Donna Dellatore, from a judgment of conviction entered in the Superior Court in which a jury found her guilty of second-degree murder. The trial justice denied the defendant's motion for a new trial, sentenced her to fifty years imprisonment (with thirty years to serve and twenty years suspended with probation), and ordered her to attend counseling upon her release. This appeal followed. We affirm the judgment of the Superior Court. The facts insofar as pertinent to this appeal are as follows.

On February 12, 1994, Donna Dellatore (defendant) began complaining of pain to Armando Mejia (Mejia), her partner, with whom she shared an apartment at 144 Central Street in Central Falls. The pain continued into the following day. The defendant refused Mejia's offers to take her to the hospital and instead sent him to the store to purchase medicine for menstrual cramps and sanitary napkins. On February 14, Mejia went to work with defendant's assurances that she would be fine. Concerned about defendant's condition, Mejia returned home early from work and found defendant in bed. Upon seeing Mejia, defendant stated, "I'm sorry, I'm sorry * * * I didn't know we were pregnant." She then told Mejia that she had given birth to a baby while he was at work. Mejia entered the bathroom and found the baby in the toilet. After the baby failed to respond to his touch or display any signs of life, Mejia proceeded to leave the apartment and call the paramedics.

Shortly thereafter, the paramedics arrived at defendant's apartment. Upon entering the apartment, they found defendant wrapped in a blanket, lying on a mattress on the floor. The paramedics were then led into the bathroom by Mejia. They found the body of a newborn girl in the toilet, partially submerged in water. After checking for vital signs, the infant was declared "DOA" (Dead on Time of Arrival). The defendant was then taken to the hospital by the paramedics. At the hospital, defendant acknowledged that she had given birth to a baby that morning. She also admitted that her stomach had become larger and that she had had no menstrual periods since the previous May. However, because her menstrual cycle had always been irregular (she had often gone several months without menstruating), because she was naturally large in the stomach, and because she was thirty-five-years-old and had never before conceived (despite a previous ten-year marriage), she had not understood that she might be pregnant.

Doctor Elizabeth Laposata (Laposata), the state medical examiner, conducted an autopsy on the baby. Her examination revealed a Y-shaped laceration on the right side of the back of the baby's skull. Laposata viewed this laceration as evidence of blunt trauma. Underneath that wound was a smaller, "cutting" type of wound, possibly made by a fingernail. An internal examination revealed a depressed skull fracture with an area of hemorrhage underneath the laceration on the right side of the temporal lobe. The examination was otherwise unremarkable, indicating a normally developed, full-term baby.

Laposata determined that the baby had not been stillborn. She based this determination on the presence of air in the alveoli of the baby's lungs, which established that some breathing had taken place, and on the hemorrhaging surrounding the head wound, which indicated "an effective heartbeat," sufficient to support blood flow throughout the body. The doctor opined that blunt head trauma had been the main cause of the baby's death.

Based on the fact that the infant had an effective heartbeat, but had never had the opportunity to fully expand her lungs to achieve effective respiration, Laposata concluded that the trauma was sustained very shortly after birth. She said that the absence of any blood in the amniotic fluid and the lack of any injuries to defendant eliminated the possibility that the injuries had occurred before birth because such trauma could not have been suffered by the baby in utero absent the presence of "significant injuries" to the mother.

Laposata rejected the possibility that the infant had suffered the head injury when she fell, unassisted, to the floor or onto the toilet during the birthing process. In order to attain sufficient force to cause the type of injury that the baby suffered, it would have been necessary to not only drop the baby, but also to exert additional energy moving the baby's body against a blunt surface. This would have required that the baby be "totally expelled from the mother's body." Laposata did acknowledge that the injury theoretically could have occurred when the baby had been only partially expelled from the mother's body, as long as the head had emerged from the birth canal and one had possessed "the geometry and the physical ability" to move the child's head with sufficient force against a blunt object to effect such trauma. Such a scenario would have required "some very unusual circumstance[s]," such as the mother's "jumping downstairs with the baby partially protruding from her."

■ The defendant was charged with one count of first-degree murder arising out of the death of her newborn infant. During trial, the trial justice granted defendant's motion for judgment of acquittal on the first-degree murder count, but denied that motion insofar as it sought acquittal on the charges of second-degree murder and manslaughter. The trial justice refused defendant's request to instruct the jury that for a baby to have been "born alive," the jury must find that the baby had been fully expelled from her mother's body and that she had had a separate and independent existence. Such a finding, defendant argued, was necessary to sustain a homicide conviction for the baby's death. *See State v. Amaro*, 448 A.2d 1257, 1259 (R.I.1982). Specifically, defendant asked the trial justice to instruct the jury as follows:

"Request # 9: Separate and independent existence means that the injury must have been inflicted when the baby was fully expelled from the mother. In other words, if you are not satisfied beyond a reasonable doubt to this point, you must acquit.

"Request # 10: In order to prove that the baby was born alive, the main evidence is whether the child took a breath.

"Request # 11: In order to prove that the baby was born alive, you may consider as factors whether there was air in the lungs, whether the baby breathed,

did the baby cry, was the body moving, were there any problems with the birthing process.

"Request # 12: In order to prove a separate and independent existence, you must find that the baby had breathed in order to attain separate respiration and circulation from the mother."

The trial justice instead instructed the jury as follows:

"First of all, there cannot be a murder unless there is a live victim. So, the State has the obligation of proving to you through the evidence that Baby Dellatore at the relevant times was alive, and that the baby had the capacity and capability of living separate and apart from its mother upon being delivered out of the womb, and that the baby, as I say, lived separate and apart without artificial means, such as an incubator or special extraordinary drugs or something of that nature being administered to it. In other words, it was a basically normal, healthy baby, and that if all other things had been appropriate it could have lived. That is what being born alive means.

"Obviously, if you conclude, based upon the evidence that the baby was born dead, it was stillborn, well, then, there cannot be a second degree murder. The ancient common law has examples of someone going through a window in the middle of the night bent upon killing someone, they find out later that the person, the intended victim had actually died two days earlier. While the person may have stabbed something, it was not stabbing a living human being, so there was no murder. Similarly, in this case, the baby must have been born alive; that is one element the State must show."

On appeal, defendant contends that the trial justice erred in refusing defendant's request, and, in so doing, committed reversible error.

▮▮▮▮ A trial justice "shall instruct the jury in the law relating to the action."

G.L.1956 § 8–2–38; *see State v. Arpin*, 122 R.I. 643, 666, 410 A.2d 1340, 1352 (1980); *State v. Butler*, 107 R.I. 489, 490, 268 A.2d 433, 434 (1970); *Macaruso v. Massart*, 96 R.I. 168, 172, 190 A.2d 14, 16 (1963). However, a "trial justice is free to instruct the jury in his or her own words, provided that he or she states the applicable law." *State v. Parkhurst*, 706 A.2d 412, 418 (R.I.1998) (citing *State v. Marini*, 638 A.2d 507, 517 (R.I.1994)). "[I]t is not reversible error for a trial justice to refuse to give instructions requested by a defendant, as long as the charge given adequately covers the law relating to the request." *State v. Grundy*, 582 A.2d 1166, 1170 (R.I.1990). On appeal, this Court reviews a challenged instruction in the context of the entire charge to determine how a jury composed of ordinarily intelligent people would have understood the instructions as a whole. *See State v. Cipriano*, 430 A.2d 1258, 1262 (R.I.1981). If the Court determines that a reasonable juror would not have misconstrued the instructions, then the trial justice's instructions will be upheld. *See id.; see also Parkhurst*, 706 A.2d at 418.

▮▮▮ The *Amaro* test requires that a victim be "born alive" in order to sustain a criminal conviction for homicide. *See Amaro*, 448 A.2d at 1259. It sets forth two very specific criteria that must be met before that conviction can be obtained. First, the baby must have been "totally expelled from the mother." *Id.* Second, the baby must have shown signs of "independent vitality." *Id.* Both parts of the *Amaro* test were addressed by the trial justice in his instructions. The first part of the test ("totally expelled") was addressed by the trial justice in his instructions to the jury when he instructed the jury that not only must the baby have "had the capacity and capability of living separate and apart from its mother *upon being delivered out of the womb*," (emphasis added), but also that the baby must have "lived separate and apart without artificial means." The trial justice set this out as a conjunctive proposition: the baby had to

have both the capacity and capability to live outside the mother's womb *and* the baby actually must have done so. The former without the latter would have been insufficient. Any reasonably intelligent juror would have understood that the trial justice's instruction required a finding that the baby had the capacity and capability to live *outside* the mother's womb and that the baby *actually* did so to be considered "born alive."

 Moreover, "a trial justice need only instruct a jury regarding those rules of law that must be applied to the issues raised at the trial." *State v. Medeiros,* 535 A.2d 766, 772 (R.I.1987). "[A] requested jury instruction should not be given if it is not supported by the evidence admitted at trial because such an instruction tends to mislead or confuse the jury." *State v. Mastracchio,* 612 A.2d 698, 707 (R.I.1992) (holding that the evidence did not support giving the instruction requested by the defendant as the theory underlying the instruction "truly stretche[d] the bounds of credibility"). Assuming arguendo that a reasonably intelligent juror would not have understood the trial justice's instruction to require that the baby must have been expelled totally from the mother's body to be considered born alive, any error that occurred from failing to give the requested instruction was harmless because the evidence did not support giving such an instruction to the jury. Laposata's testimony refuted the defendant's theory that the baby's falling unassisted from the mother caused the baby's head to slam forcefully against the toilet seat, resulting in the fatal skull fracture. The amount of force needed to cause the head trauma that the baby suffered would had to have been significantly greater than the force generated by a drop. It would have been necessary to not only drop the baby, but also to exert additional energy moving the baby against a blunt surface. Although Laposata acknowledged it was theoretically possible that the fatal injury could have occurred with only part of the baby protruding from defendant's body, that would have required extremely unusual circumstances—that is, the mother's jumping downstairs with only part of the baby protruding from her body. There was no evidence to support a reasonable inference that such a scenario had occurred.

The second part of the *Amaro* test requires that "independent vitality" be shown. This part of the test similarly was addressed by the trial justice's instructions. The trial justice said in his instructions that the baby had to have "the capacity and capability of living separate and apart from its mother," and that it must in fact have "lived separate and apart without artificial means." The trial justice's reference to a "capacity" and a "capability" of living separate and apart from the mother did not change or muddle the meaning of his instruction; he stressed that the child had to have "lived separate and apart without artificial means." His directive was clear. Any reasonably intelligent juror would have had no difficulty in discerning that a physically independent existence depended upon the sufficient development of the baby's own circulatory and respiratory systems.

 The defendant also argues that the court erred in refusing to give defendant's requested mistake-of-fact instruction. In appropriate circumstances, this Court does recognize the mistake-of-fact defense. *See State v. Tevay,* 707 A.2d 700 (R.I.1998) (holding that no mistake-of-fact instruction was necessary when the trial justice had emphasized in his instruction to the jurors that it was their obligation to find that defendant's conduct was intentional beyond a reasonable doubt as a predicate to a guilty verdict). Here, the jury was instructed that in order to convict defendant of second-degree murder, it must find that defendant acted with the intent to kill a living human being. Although manslaughter did not require a specific intent to kill a living human being, it did require a finding that defendant

acted with recklessness or criminal negligence in breaching a duty to aid her child. Thus, in order to convict defendant of either second-degree murder or manslaughter, the jurors had to find that the baby was a *living* human being when she was killed, and that defendant acted either intentionally, recklessly, or with a high degree of negligence. Such instructions by the trial justice precluded the necessity of a mistake-of-fact instruction.

▮▮▮▮ Finally, defendant argues that the trial justice erred in restricting the portions of the medical examiner's testimony read back to the jury. It is well established that the decision to have testimony read back to the jury during deliberations is within the sound discretion of the trial court. *See State v. Dame,* 488 A.2d 418, 422 (R.I.1985) (citing *Stone v. United States,* 506 F.2d 561, 564 (8th Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Pinckney v. United States,* 352 F.2d 69, 70 (5th Cir.1965)). "Generally, such a request should be honored." *State v. Haigh,* 666 A.2d 803, 804 (R.I.1995) (citing *Dame,* 488 A.2d at 422). When a trial justice grants the jury's request to have testimony read back, he or she must ensure that it is done in an impartial manner so it does not invade the province of the jury. *See State v. Pierce,* 689 A.2d 1030, 1035 (R.I.1997). Here, the jury specifically requested to see a copy of Laposata's testimony regarding the scale used to determine the severity of force. This testimony was read back to the jury. However, the jury was not read back a portion of the testimony in which the trial justice had asked whether the scale was numerical and Laposata had responded that it was not,[1] nor was the jury read back defendant's cross-examination of Laposata. Given that Laposata's testimony was neither undermined by the trial justice's question nor by cross-examination, and that the testimony about the scale was

not the only evidence heard by the jury concerning force, the court's decision to limit the reading back of the testimony to Laposata's testimony concerning the scale was, at worst, harmless error. *See Pierce,* 689 A.2d at 1034–35 (holding that trial justice's decision to omit rereading of witness's testimony that her memory was blurred was reversible error in sexual assault trial because this testimony was crucial to the question of whether the episode had occurred before or after the witness's fourteenth birthday); *State v. Gomes,* 604 A.2d 1249, 1259–60 (R.I.1992) (holding that reading only a portion of a witness's testimony to the jury was harmless error when the same information was elicited from other witnesses).

For the reasons stated, the defendant's appeal is denied and the judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

---

**1.** Laposata explained that the scale measured force by looking at the displacement in the head caused by the injury. She explained that there was a continuum of injury that

spanned from the least amount of displacement (that is, a bruise) to the greatest amount of displacement (that is, an open skull fracture with bone fragmentation).