## STATE

v.

## Marc DUMAS.

No. 2002–165–C.A.

Supreme Court of Rhode Island.

Nov. 25, 2003.

440

Jane McSoley, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J.,
FLANDERS, FLAHERTY, and
SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

Retried and found guilty once again of second-degree murder for strangling a Woonsocket woman, the defendant, Mark Dumas (Dumas or defendant), asks us on appeal to reverse his conviction and to remand this case for a third trial. Insisting that he reasonably believed the victim already was dead when he admittedly tied a rope around her neck and, as the jury found, strangled her, he argues that the

trial justice grievously erred by failing to provide the jury with the mistake-of-fact instruction that he requested the court to give. He also posits that the trial justice committed reversible error when he refused to include his lawyer's cross-examination of a police officer as part of the testimony that the trial justice read back to the jurors when they asked him for "a police witness statement * * * during the time the tape was over and the defendant said, 'I did it.' "

On Dumas's first appeal, *State v. Dumas*, 750 A.2d 420, 426 (R.I.2000) (*Dumas I*), we remanded the case to the Superior Court for it to determine whether Dumas unequivocally had requested a lawyer when the police were questioning him and tape-recording his custodial statements. On remand, the Superior Court ruled that Dumas had done so. Consequently, the court vacated his conviction, granted him a new trial, and suppressed certain statements that the police had obtained from Dumas after he requested to speak with a lawyer. Nevertheless, after the retrial, even after the trial justice excluded the previously contested recording, a second jury also found him guilty of second-degree murder.

Because the facts pertaining to the murder are described fully in *Dumas I,* we will not recapitulate them here. Rather, we shall proceed directly to the two arguments that Dumas raises on his appeal from his murder conviction after the second trial—and to the reasons why we conclude they are unavailing.

## I

**In Light of the Intent–to–Kill Jury Instruction, the Trial Justice's Failure to Give the Defendant's Requested Mistake–of–Fact Instruction Did Not Constitute Reversible Error**

Although Dumas admitted that he tied the rope around the victim's neck, he

suggested that he did so only after he believed that the victim already was dead because his accomplice had just finished strangling her with his hands. The medical examiner, however, testified that the victim did not die from manual strangulation but from the tightening of the ligature that Dumas had cinched around her neck.

At his second trial, Dumas requested the trial justice to instruct the jury as follows:

"Mistake of fact will disprove a criminal charge if the mistaken belief is:

a. Honestly entertained;

b. Based upon reasonable grounds; and

c. [O]f such a nature that the conduct would have been lawful and proper, had the facts been as they were reasonably supposed to be. Perkins on Criminal Law, 2nd Ed., P. 939–940."

The trial justice, however, refused to do so, instructing the jurors instead on what they had to find to return a guilty verdict against defendant for the crime of murder:

"Murder is an unlawful taking of a human life by another human being contrary to law with malice aforethought. The malice aforethought necessary for * * * murder can be proven in two ways. Malice might consist of actual malice or implied malice. When malice is express[ ] malice, it arises from the express[ ] intent to kill or inflict great bodily harm. The actual malice may be in existence for a mere moment prior to a lethal act. Malice aforethought is only a momentary instance. If you find that the defendant had a total disregard for the sanctity of life [*sic*]."

■■■ A trial justice must instruct the jury "in the law relating to the action." G.L.1956 § 8–2–38. When instructing a jury, "[t]he trial justice may instruct the jury in his or her own words as long as the charge sufficiently addresses the request-

ed instructions and correctly states the applicable law." *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988). Thus, a trial justice's refusal to instruct the jury as a party requests is not reversible error as long as the charge given adequately covers the law relating to the request. *State v. Parkhurst,* 706 A.2d 412, 418 (R.I.1998); *State v. Grundy,* 582 A.2d 1166, 1170 (R.I. 1990). In addition, the court should not instruct the jury as requested by a party when the evidence does not support such instructions, especially when they might mislead or confuse the jury. *State v. Dellatore,* 761 A.2d 226, 231 (R.I.2000) (citing *State v. Mastracchio,* 612 A.2d 698, 707 (R.I.1992)).

In *Dellatore,* 761 A.2d at 232, this Court held that, in a second-degree murder case, the trial justice's instruction on the necessity of proving intent to kill obviated any need for the trial justice to give the defendant's requested mistake-of-fact instruction. In that case, a woman gave birth in her apartment. *Id.* at 228. Although the authorities pronounced the infant dead at the scene, the medical examiner determined that the baby was not stillborn but had suffered trauma to the head after it was born alive. *Id.* at 228–29. At trial, the court instructed the jury that it must find "intent to kill" or "recklessness or criminal negligence in breaching a duty to aid her child" to find the defendant guilty of second-degree murder or manslaughter, respectively. *Id.* at 231–32. Therefore, the Court reasoned, for the jury to convict the defendant of either second-degree murder or manslaughter, the jurors had to find that the baby was a living human being when the head trauma occurred. *Id.* at 232. This Court held that "such [an intent-to-kill] instruction[ ] by the trial justice precluded the necessity of a mistake-of-fact instruction." *Id.*

Here, as in *Dellatore*, the trial justice's instructions to the jury on the prosecutor's need to prove intent sufficiently covered the subject matter of Dumas's request for a mistake-of-fact instruction, such that the court's refusal to give the latter instruction did not constitute reversible error. The trial justice instructed the jurors that, to find defendant guilty of second-degree murder, they must find that malice aforethought existed. The trial justice defined malice aforethought as either the "express[ ] intent to kill or inflict great bodily harm," or a "total disregard for the sanctity of life." Thus, for the jury to find the requisite intent to kill, it necessarily had to determine that defendant believed the victim was alive and that he intended to kill her when the ligature strangulation occurred. Consequently, as in *Dellatore*, the intent instruction that the trial justice gave to the jury obviated the need for a separate instruction concerning mistake of fact.

For this reason, even were we to assume, *arguendo*, that Dumas's admitted conduct in cinching the rope around the victim's neck because he believed she already was dead was "[b]ased upon reasonable grounds" and that his conduct in doing so "would have been lawful and proper, had the facts been as [he] reasonably supposed [them] to be"—propositions that would be dubious at best even without the intent-to-kill instruction—we still would reject this aspect of Dumas's appeal.

## II

### Because the Defendant's Cross–Examination of the Police Officer Did Not Undermine His Direct Testimony, the Trial Justice Did Not Commit Reversible Error in Reading Only the Direct–Examination Testimony Back to the Jury

■ Dumas next argues that the trial justice denied him a fair trial because the court decided to re-read to the jury only a portion of a police officer's direct examination, without re-reading the corresponding cross-examination.[1] After beginning its deliberations, the jury sent the following note to the trial justice: "May we have a police witness statement of during the time the tape was over and the defendant said, 'I did it'?" The trial justice responded, "Are you asking for a statement from the police or [do] you want the testimony read back?"—to which the foreperson replied, "The testimony." The trial justice then read to the jury a portion of the direct

---

1. The direct testimony of the witness, police Commander William F. Mack, communicated that the police attempted to elicit a response from defendant during a break in the videotaping of his custodial statement to the police by showing him crime-scene photographs. The testimony described the sequence of events that took place when the police showed defendant photographs of the crime scene. According to Commander Mack, in response to the question "Who tied that knot?"—referring to the knot in the rope tied around the victim's neck—defendant stated, "I did." The officer's direct testimony then went on to describe the immediate police response to this admission. The defendant argues that on cross-examination defense counsel brought out that, although Commander Mack had ordered the earlier videotaping

of the interview, he was confronting defendant face-to-face for the first time with three other officers in the room during the break and that he expected to elicit some response from defendant. Nevertheless, he did not record the break in the videotaping. In addition, during cross-examination Commander Mack said that he did not write up the witness's statement himself or put down on paper the events that occurred during the break in videotaping. The defendant argues that this information calls into question the veracity of Commander Mack's account and of those other police witnesses who testified about what happened during the break in videotaping. Therefore, he argues, the cross-examination of Commander Mack should have been re-read to the jury along with Commander Mack's direct-examination testimony.

testimony of a police witness (Commander Mack) on this subject. At the close of the reading, the jury then asked "[I]s there a police statement?"—to which the court responded "Not in evidence, no."

▆▆▆ The decision of whether to read any trial testimony back to the jury—in response to a jury question about hearing certain evidence again—is one that is committed to the sound discretion of the trial justice. *State v. Pierce,* 689 A.2d 1030, 1035 (R.I.1997); *State v. Dame,* 488 A.2d 418, 422 (R.I.1985) (citing *Stone v. United States,* 506 F.2d 561, 564 (8th Cir.1974), cert. denied, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975) and *Pinckney v. United States,* 352 F.2d 69, 70 (5th Cir.1965)). Generally, however, the trial justice should attempt to honor such a request, *State v. Haigh,* 666 A.2d 803, 804 (R.I.1995) (per curiam); *Dame,* 488 A.2d at 422—especially when it is practically possible to do so without consuming an inordinate amount of time and without misleading the jury. But in determining how to respond to a jury's request to rehear certain testimony, a trial justice should consider not only the time the readback would take to accomplish, but also whether the request is "reasonably well-focused" and whether there is any "physical or logistical impairment" to re-reading the testimony. *United States v. Akitoye,* 923 F.2d 221, 226 (1st Cir.1991) (quoting *United States v. Argentine,* 814 F.2d 783, 787 (1st Cir.1987)). Moreover, any such a re-reading must be impartial and must not invade the jury's province to determine the facts of the case. *Pierce,* 689 A.2d at 1035.

## A. Narrowing the Scope of the Jury's Inquiry

▆▆▆ To assure that the information provided to the jury is responsive to the subject of its inquiry, a trial justice may ask the jury to narrow the scope of the testimony it requests to have read back to it. *See Akitoye,* 923 F.2d at 225–26; *People v. Reynolds,* 57 Ill.App.3d 593, 15 Ill. Dec. 304, 373 N.E.2d 650, 653 (1978); *State v. Giblin,* 568 A.2d 769, 772 (R.I. 1990). Obtaining, a "well-focused" jury question will aid the trial justice in determining whether the jury's request should be granted, *Akitoye,* 923 F.2d at 226; it also assures that the information provided will be responsive to the subject of the inquiry, *see Giblin,* 568 A.2d at 771; and it may help to maintain the impartiality of the court's response, *see Reynolds,* 15 Ill. Dec. 304, 373 N.E.2d at 653.

Thus, in *Giblin,* 568 A.2d at 772, this Court approved of the trial justice's attempt to narrow a jury's broad request for a readback of testimony. Initially, the jury requested the " 'testimony of both women regarding where they were and what they saw at the time the trigger of the gun was pulled.' " *Id.* at 771. Honoring such a request, however, would have required a readback of virtually all the testimony of both witnesses. *Id.* Consequently, the court asked the jury to narrow their request; however, it made clear that if the jury truly wanted to hear all the testimony, the court would provide it. *Id.* In reviewing the trial justice's actions, this Court stated: "We cannot fault the trial justice for the manner in which he responded to the jurors' inquiry." *Id.*

▆▆▆ Here, as in *Giblin,* the jury's request for "a police witness statement" concerning defendant's "I did it" statement during a break in the videotaping presented the trial justice with a potential readback of testimony that was broad in scope. Three different police officers testified about this incident on both their direct and

cross-examinations.[2] The trial justice, however, selected only Commander Mack's direct testimony to be re-read to the jury. As in *Giblin* and *Akitoye*, when faced with a potentially broad jury request for a read-back of testimony that may prove time consuming and encompass a number of witnesses, it may be advisable for the trial justice to attempt to narrow the jury's question. In doing so, the court still should attempt to meet the thrust of the jury's inquiry, while taking care that the testimony it reads to the jury remains as impartial and as representative of the evidence adduced on this subject as is practically possible under the circumstances.

## B. Determining the Importance of the Information Obtained During Cross–Examination

If the testimony elicited on cross-examination goes directly to the subject matter of the questions asked on direct and is crucial to the determination of the defendant's guilt or innocence, then it should be re-read to the jury together with the direct testimony. *See Pierce*, 689 A.2d at 1035. But when, as here, the effect of the cross-examination has not been to undermine the direct testimony, and the jury has heard other evidence on this same subject from other witnesses, then any error by the court in limiting the re-reading only to the direct examination would amount, at worst, to harmless error. *Del-*

*latore*, 761 A.2d at 232 (citing *Pierce*, 689 A.2d at 1034–35 and *State v. Gomes*, 604 A.2d 1249, 1259–60 (R.I.1992)).

In *Dame*, 488 A.2d at 423, this Court held that the trial justice should include information elicited on cross-examination with any summary of the direct testimony that the court provides to the jury when the information developed on the cross-examination was crucially important and pertinent to answering a jury question about that subject. In that case, the state charged the defendant with arson. *Id.* at 420. Precisely when the fire began was crucial to prove or disprove both defense and prosecution theories about the defendant's culpability. *Id.* at 421–22. In response to a jury question concerning what a particular witness had said about when the fire began, the trial justice summarized the direct testimony of the witness, including an approximation of when the fire started. *See id.* at 422. The trial justice, however, omitted a portion of the cross-examination in which the defense attorney successfully undermined the precision of the witness's estimation of when the fire began.[3] *Id.* This Court held that "[t]he trial justice may not summarize only direct testimony if the testimony on cross-examination is also pertinent to the determination of the issue that is the subject of the request," *id.* at 423—at least when "the importance of the testimony involved made the summary by the trial justice of only

---

2. Commander William F. Mack, Det. Allen Renaud, and Det. Edward M. Roy all described the events that occurred during the break in the videotaping, during which Dumas allegedly admitted that he tied the rope around the victim's neck.

3. On direct examination, the witness estimated that the fire had been smoldering for approximately one-half hour before the roof caved in. *See State v. Dame*, 488 A.2d 418, 421 (R.I.1985). He then estimated the time

the fire started based on that approximation. *See id.* at 423 n. 1. On cross-examination, however, he admitted that the fire could have been smoldering longer than he testified to on direct. *Id.* In addition, he admitted that he based his estimated start time for the fire on facts about the building structure as he knew them to be on the night of the fire, but not on the different and additional facts that he currently knew about the construction of the building. *Id.*

direct testimony inadequate and potentially misleading to the jurors." *Id.*

Likewise, in *Pierce*, 689 A.2d at 1035, this Court deemed the omitted cross-examination crucial to the outcome of the case and, therefore, held that it should have been re-read to the jury. The state had charged the defendant with, among other offenses, first-degree child molestation with a person fourteen years of age or younger. *Id.* at 1032. On direct examination the victim testified that she was fourteen or younger when the assault took place; on cross, however, she admitted that the dates of different assault incidents had "blurred together." *Id.* at 1035. The Court held that the cross-examination should have been re-read to the jury along with the direct testimony because the information went directly to the question of whether the assault had occurred before the victim's fourteenth birthday, a fact which was "crucial to the determination of defendant's guilt or innocence." *Id.*

Unlike *Dame* and *Pierce*, however, the information elicited on Commander Mack's cross-examination in this case was not so crucially important as to prove or disprove either prosecution or defense theories in the case; nor did it prove or disprove an essential element of the crime charged. One reason why it was not "crucial" to these determinations is because this was not Dumas's only admission that he tied the rope around the victim's neck.[4] Additionally, nothing Commander Mack said on cross-examination undermined the events he described in his direct testimony or rendered them potentially misleading. The lack of a written statement by Com-

mander Mack about the events that occurred during the break in videotaping was not only outside the scope of the jury's question, but also it was not the kind of "crucial" information that this Court adjudged necessary in *Dame* and *Pierce* to avoid presenting the jury with a potentially misleading picture of the evidence. Rather, as Dumas argues, the information elicited during the cross-examination of Commander Mack merely attempted to test the credibility or veracity of his recollection without having the effect of directly undermining it in any significant way. The jurors were qualified to determine the credibility of this witness based on their opportunity to hear the cross-examination and to observe the manner and demeanor of the witness throughout his testimony.

Although it may be advisable in some circumstances for a trial justice to attempt to narrow the scope of a broad request from the jury for a readback of testimony, the cross-examination omitted in this case from the readback neither undermined the direct examination that the court read to the jury, nor was it the only evidence of this type that the jury had heard. Therefore, the trial justice did not abuse his discretion in failing to read back the cross-examination of Commander Mack to the jury. In any event, as in *Dellatore*, given the relatively inconsequential nature of the information adduced during this witness's cross-examination, such an omission from the readback of the testimony constituted, at worst, mere harmless error. *Dellatore*, 761 A.2d at 232 ("the court's decision to limit the reading back of the testimony * * * was, at worst, harmless error").

---

4. The court also admitted into evidence a typed and signed witness statement of Dumas in which, in response to questions, he stated: "I tied the rope around her neck" and "Mike made me tie the rope around her neck." Ad-

ditionally, in a videotape of his questioning viewed by the jury, defendant stated: "That's the way [the accomplice] made me tie the rope."

## Conclusion

For these reasons, we affirm the defendant's convictions.

Justice GOLDBERG did not participate.