STATE

v.

Kevin ADEFUSIKA.

No. 2007–192–C.A.

Supreme Court of Rhode Island.

March 2, 2010.

Christopher Bush, Department of Attorney General, for Plaintiff.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The issues before us in this appeal arise from an indictment charging an alleged sexual assault and the trial thereof. The defendant, Kevin Adefusika, appeals from a judgment of conviction entered after a jury trial in the Washington County Superior Court. He alleges that the trial jus-

tice committed reversible error on multiple occasions—*viz.*, (1) in refusing to give a certain jury instruction requested by the defendant; (2) in permitting a court reporter to read back a particular portion of the complaining witness's trial testimony; (3) in allowing a rebuttal witness to comment on the demeanor of two defense witnesses; and (4) in denying the defendant's motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On June 9, 2006, a Washington County grand jury indicted Mr. Adefusika on one count of first-degree sexual assault (sexual penetration), in violation of G.L.1956 §§ 11–37–2 and 11–37–3, and one count of second-degree sexual assault (hand to breast contact), in violation of §§ 11–37–4 and 11–37–5. The charged offenses allegedly took place in the early evening of March 17, 2006. A jury trial was held on November 29, November 30, December 1, and December 4, 2006. We summarize below the most pertinent testimony from that trial.

## A

### The Testimony at Trial

The prosecution presented three witnesses at trial: the complaining witness, an eighteen-year-old young woman whom we shall call Stephanie;[1] Stephanie's mother whom we shall call Jennifer; and Westerly Police Officer Christopher Peloso.

Stephanie testified that, on March 17, 2006, she received a telephone call at her

---

1. We shall refer to most of the several civilians involved in this case pseudonymously in order to protect their privacy.

Wakefield home from her friend Lisa. Lisa, a sixteen-year-old high school student, was calling to ask whether Stephanie wanted to "hang out"—something that the two young women did on an almost daily basis. Lisa offered to stop by Stephanie's home with a friend. Stephanie, who had known Lisa for several months, accepted her invitation and her offer of a ride. At approximately 4 p.m., Lisa arrived at Stephanie's home accompanied by Mike Adefusika, who was Lisa's friend and also the brother of defendant, Kevin Adefusika;[2] Stephanie had not met Mike before. Stephanie assumed that they would be driving to Lisa's home in Charlestown. Instead, Mike told Stephanie that they would be driving to his home in Westerly.

Once having arrived at the Adefusika home in Westerly, Stephanie, Lisa, and Mike all went to Mike's bedroom; they were joined there by Mike's brother, Kevin. Stephanie testified that she introduced herself to Kevin and that the group of four proceeded to talk and play videogames in Mike's bedroom. Stephanie further testified that, while they were in Mike's bedroom, everyone except her drank and smoked.

After about an hour, Lisa mentioned to the Adefusika brothers that Stephanie liked to dance and indeed had been asked to become a professional dancer. Stephanie testified that defendant then asked her to dance for him; she said that he repeated this request "[a] couple of times" over the course of about twenty minutes. Stephanie testified that she became uncomfortable and that she refused defendant's repeated requests for her to dance. Stephanie asked Lisa if she wanted to go outside to smoke a cigarette, and Lisa agreed.

Once outside, Stephanie told Lisa that she was uncomfortable and was ready to leave. Stephanie testified that Lisa accused her of being a racist[3] and also said to Stephanie, "[L]et me do my thing with Mike first." After Stephanie had finished her cigarette, the two young women went back inside the house. Lisa returned to Mike's bedroom, shutting the door behind her. Stephanie testified that at that point she heard loud music emanating from Mike's room.

Stephanie walked into the living room, where defendant was sitting on a couch. Stephanie testified that, because she felt uncomfortable in the presence of defendant, she sat on the arm of the couch at the opposite end from where he sat. After the two of them engaged in some small talk, Stephanie moved from the arm to the cushion of the couch (but still at the opposite end from where defendant was sitting). At that point, defendant began professing his admiration for Stephanie. Stephanie testified that defendant told her that she was "the perfect girl" and that he wanted to marry her, all the while continuing to move toward her.

Stephanie testified that, once defendant had moved "pretty close" to her, he "forced himself on top of" her, pushing her back on the couch and holding her hands above her head with both of his hands. Stephanie further testified that defendant then started kissing her neck and told her that he wanted to give her a "hickey" because he wanted "everybody to know that [she was] his." After Stephanie told defendant that she did not want a "hickey," he stopped trying to give her one.

Stephanie testified that defendant then removed one of his hands from hers, but he continued to hold both of her hands

---

2. For the sake of clarity, we shall refer to the Adefusika brothers by their first names.

3. The Adefusikas are black, while Stephanie is Caucasian.

with his other hand. Stephanie further testified that defendant put his free hand inside her shirt and touched her breasts over her bra for "a little while." According to Stephanie, defendant then moved his hand down into the front of her pants; she said that he proceeded to slide his hand under her underwear and to insert his finger inside her vagina for several seconds.

Stephanie testified that she had never asked defendant to touch her breasts or vagina and that she did not want him to do so. She further testified that, while defendant was performing the above-described acts, she repeatedly told defendant "no" and asked him to stop. She testified that she also tried "lifting [her] body and moving [her] arms;" she added that she was unable to do so because she was much smaller than he was.

Stephanie further testified that, after defendant removed his finger from her vagina, he started moving his hand "toward [her] butt." She testified that, as defendant did so, he "let go of [her] hands a little bit;" she stated that she then slapped him in the face and climbed out from underneath him. It was Stephanie's testimony that, at that point, defendant "flipped out" and began to yell and scream and to call her names.

Stephanie testified that she then ran toward a nearby hallway, grabbed a cordless phone that she saw sitting on a table, and went into a small closet-like room, positioning her body against the door to keep it closed. Stephanie used the phone to call her mother, Jennifer, to ask her to come and pick her up.

After speaking with her mother, Stephanie left the room from which she had made the phone call and started to walk outside. By then, Lisa and Mike had moved from Mike's bedroom to the living room, and defendant was in the kitchen. According

to Stephanie (testifying upon refreshed recollection), as she walked past defendant on her way outside, he told her that "he was going to hunt [her] down and rape [her]." Stephanie continued out of the house and walked to the end of the street on which the Adefusika home was located; she waited there for her mother.

After Stephanie had waited outside for fifteen to twenty minutes, Lisa and Mike drove up in a car and told her to get in. It was Stephanie's testimony that she agreed to get in the car because she "just wanted to get out of there." Stephanie testified that Mike apologized for defendant's behavior and that he let her use his cell phone to call her mother, who was having a difficult time finding the Adefusika residence. In that phone call, Jennifer (Stephanie's mother) agreed to meet Stephanie at a nearby restaurant in Westerly, and Lisa and Mike then drove Stephanie there.

When Stephanie and her companions arrived at the restaurant, Stephanie quickly exited the vehicle. Jennifer pulled into the parking lot moments later, and Stephanie departed with her. She testified that her mother then drove her to the home of her (Stephanie's) grandmother in Charlestown. There, Stephanie told her mother what had happened, and Jennifer called the Westerly police. Stephanie eventually called the police herself, and she then went to the Westerly police station to provide a statement.

Stephanie's mother, Jennifer, also testified for the prosecution. She stated that she had been home watching television on the evening of the alleged assault when Stephanie called her, crying. Jennifer testified that she picked up Stephanie at the above-referenced Westerly restaurant and then later drove her to the Westerly police station.

Westerly Police Officer Christopher Peloso testified that he went to the Adefusika residence at approximately 2 a.m. on March 18 (*i.e.*, the morning immediately after the alleged sexual assault) in order to retrieve Stephanie's handbag, which she had accidentally left in the car that Mike Adefusika had driven. Officer Peloso testified that he spoke with defendant, who denied that there had been any women at his house on the previous night, although his brother (Mike) had admitted that women had been there.

Officer Peloso was also dispatched to Lisa's home. At approximately 4 a.m., he awakened Lisa and her mother, Victoria. He told the two women that he was investigating a sexual assault, and he questioned them for forty-five minutes.

The thrust of Kevin Adefusika's defense at trial was (1) that the alleged sexual assault did not happen and (2) that Stephanie was emotionally troubled and unstable. In support of the position taken by the defense, three witnesses were presented by Kevin Adefusika's attorney. (Mr. Adefusika did not testify at trial.)

The first of the defense witnesses was Stephanie's friend, Lisa. Even though her testimony corroborated much of Stephanie's testimony as to how they ended up at the Adefusika home on March 17, 2006, Lisa also testified about her belief that Stephanie was uncomfortable with the Adefusikas because they were black. She further testified that Stephanie had told her and the Adefusikas that a friend of her ex-boyfriend [4] had raped her on the night before the March 17 visit to the Adefusika residence. In addition, Lisa testified that

Stephanie was never out of her earshot on the night in question.

The second defense witness was Victoria (Lisa's mother). She testified, in pertinent part, that Jennifer had called her on the night of the alleged sexual assault, asking if she knew where Lisa was and saying that Stephanie had called her and was "really scared" and was "freaking out." Victoria testified that, when she thereafter reached Lisa by telephone, she also spoke with Stephanie, who told her that everything was "okay" and that Jennifer was "crazy" and should be ignored.

After Lisa and Victoria testified, the prosecution recalled Officer Peloso as a rebuttal witness to testify as to the manner in which Lisa and Victoria reacted when he interviewed them at their home in the early morning hours after the alleged sexual assault.[5] Officer Peloso stated that he found Victoria's demeanor toward him to be "[v]ery offensive." He further testified:

"[Victoria] was very uncooperative of me being there. She continued to be very nasty toward me. She was continuing to tell me that I was not wanted there, that I had no right to ask the questions and things of that nature."

Additionally, Officer Peloso testified that, throughout his conversation with Lisa, he noticed that "there were many inconsistencies in [Lisa's] statement."

Finally, the defense called Sue Ann Miner, a nurse at South County Hospital; she testified about a triage note that she had written when Stephanie had visited the hospital several days before the alleged

---

4. Several witnesses referred to this young man as Stephanie's "ex-boyfriend." However, Stephanie testified that, although she and her boyfriend had argued, they had not actually broken up prior to the alleged sexual assault.

5. Since the final witness for the defense was not available to testify until the day after Victoria testified, defense counsel interposed no objection concerning Officer Peloso's testifying out of order as a rebuttal witness for the prosecution.

assault. Ms. Miner read to the jury from her triage note as follows:

"'Patient is here for South Shore Mental Health eval. Patient recently broke up with boyfriend, as per mom. Patient freaking out, crying, swearing, kicking and punching walls, obsessed with ex-boyfriend. Patient denies SI,' which is suicidal ideation. 'Decreased [oral] intake.' * * * 'Alert, oriented × 3, crying slightly, angry affect toward mom. No respiratory distress.'"

Stephanie and Jennifer had also testified about that visit to the hospital. On cross-examination, Jennifer stated that she had taken Stephanie for a mental health evaluation because Stephanie was emotionally upset about "issues in our family and her boyfriend." Stephanie admitted that her mother had taken her to South County Hospital for a mental health evaluation the week before the alleged assault, but she denied that the visit had been prompted by the status of her relationship with her boyfriend.

## B

### The Jury Instructions

After the trial justice had instructed the jury, defendant took exception to several aspects of the instructions, one of which he has opted to raise on appeal. The defendant's counsel requested at sidebar that the trial justice re-instruct the jury employing particular language with respect to the meaning of the term "force or coercion" in the context of the first-degree sexual assault charge. Specifically, defendant requested that the trial justice instruct the jury as follows:

"Force or coercion within the meaning of this provision requires something more than the sexual contact itself: that is, something more than an intentional touching of the victim's intimate parts done with the purpose of sexual arousal,

gratification, or assault and without consent. At a minimum, the alleged victim must demonstrate her lack of consent before the act occurs and then must offer such resistance as is reasonable under all the circumstances."

The trial justice denied defendant's request, and the jury began its deliberations. The defendant repeated his request on the next day of jury deliberations, but the trial justice again denied the request.

## C

### The Read–Back

While the jury's deliberations were underway, the trial justice received a note from the jury foreperson, which in relevant part reads as follows:

"[I]f possible, we would like to read an excerpt of the transcript from [Stephanie's] testimony. Specifically, we want to review the portion of [Stephanie's] testimony describing exactly what happened when she and Kevin were on the couch when the alleged sexual assaults occurred."

Thereafter, the trial justice allowed the court reporter to read back from her notes what the trial justice called "the portion of the transcript of [Stephanie's] testimony describing what happened when she and Kevin were on the couch." The read-back included portions of the direct examination and of the cross-examination of Stephanie. During the course of the read-back, defendant objected to the inclusion of Stephanie's testimony about what transpired *after* "the activity on the couch had terminated." The trial justice made no ruling on the record regarding that objection; it is clear from the record, however, that the objected-to portion of the transcript was in fact read back.

## D

### The Verdict and the Sentence

On December 4, 2006, at the conclusion of the four-day trial, the jury convicted Kevin Adefusika of both the first-degree sexual assault charge and the second-degree sexual assault charge. On January 12, 2007, the trial justice denied defendant's motion for a new trial. On February 2, 2007, defendant was sentenced to forty years at the Adult Correctional Institutions, with twenty years to serve and the balance suspended with probation, in connection with the first-degree sexual assault conviction. He received a concurrent sentence of fifteen years to serve in connection with the second-degree sexual assault conviction. Thereafter, Mr. Adefusika filed a timely notice of appeal.

## II

### Standards of Review

#### A

#### The Standard of Review as to the Jury Instruction Issue

■■■ Our standard of review concerning jury instructions is well settled; we review such instructions in a de *novo* manner. *State v. Palmer,* 962 A.2d 758, 764 (R.I.2009); *see also State v. Graham,* 941 A.2d 848, 855 (R.I.2008); *State v. Imbruglia,* 913 A.2d 1022, 1031 (R.I.2007); *State v. John,* 881 A.2d 920, 929 (R.I.2005); *State v. Hurteau,* 810 A.2d 222, 224–25 (R.I.2002). In reviewing challenged jury instructions, "it is our role to examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and we review challenged portions of jury instructions in the context in which they were rendered." *John,* 881 A.2d at 929 (internal quotation marks omitted); *see also Hurteau,* 810

A.2d at 225; *State v. Krushnowski,* 773 A.2d 243, 246 (R.I.2001); *State v. Gordon,* 508 A.2d 1339, 1349 (R.I.1986). Further, "this Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *State v. Kittell,* 847 A.2d 845, 849 (R.I.2004) (internal quotation marks omitted); *see also Palmer,* 962 A.2d at 764; *State v. Hanes,* 783 A.2d 920, 925 (R.I.2001). Moreover, even if we conclude that a jury instruction was erroneous, reversal is warranted "only if a jury could have been misled to the prejudice of the complaining party." *Graham,* 941 A.2d at 855; *see also Palmer,* 962 A.2d at 764–65; *Hodges v. Brannon,* 707 A.2d 1225, 1228 (R.I.1998); *Anter v. Ambeault,* 104 R.I. 496, 501, 245 A.2d 137, 139 (1968).

#### B

#### The Standard of Review as to the Read–Back Issue

■■■ The decision as to whether or not to read back to the jury a particular witness's trial testimony in response to a jury request is confided to "the sound discretion of the trial justice." *State v. Dumas,* 835 A.2d 438, 443 (R.I.2003); *see also State v. Ros,* 973 A.2d 1148, 1176 (R.I.2009); *State v. Pierce,* 689 A.2d 1030, 1035 (R.I. 1997); *State v. Dame,* 488 A.2d 418, 422 (R.I.1985). In response to such a request, the trial justice should generally permit the read-back, "especially when it is practically possible to do so without consuming an inordinate amount of time and without misleading the jury." *Dumas,* 835 A.2d at 443; *see also Ros,* 973 A.2d at 1176; *State v. Haigh,* 666 A.2d 803, 804 (R.I.1995). A read-back must be fair and impartial, and it must not invade the province of the jury in deciding the case. *Pierce,* 689 A.2d at 1035; *see also Ros,* 973 A.2d at 1176. In reviewing a trial justice's decision as to

whether or not to permit testimony to be read back to the jury, we employ an "abuse of discretion" standard. *Ros,* 973 A.2d at 1176; *Dumas,* 835 A.2d at 445.

## C

### The Standard of Review as to the Challenged Rebuttal Testimony

This Court has held that "[t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *State v. Haslam,* 663 A.2d 902, 905 (R.I.1995); *see also State v. Lassiter,* 836 A.2d 1096, 1107 (R.I.2003); *State v. Miller,* 679 A.2d 867, 872 (R.I. 1996). A corollary principle is that "bolstering" or "vouching" (which occurs when one witness "offer[s] an opinion regarding the truthfulness or accuracy of another witness' testimony") is impermissible. *State v. Webber,* 716 A.2d 738, 742 (R.I. 1998); *see also Lassiter,* 836 A.2d at 1107. This Court will consider opinion testimony to be inadmissible "bolstering" or "vouching" if "the opinion testimony has the same substantive import as if it squarely addressed and bolstered another witness's credibility * * *." *Miller,* 679 A.2d at 872 (internal quotation marks omitted); *see also Haslam,* 663 A.2d at 905; *State v. Tavares,* 590 A.2d 867, 870–71 (R.I.1991). If we determine that certain testimony constitutes impermissible "bolstering" or "vouching," our task in reviewing a trial justice's decision to admit such testimony is to determine whether the admission of the testimony constituted prejudicial error with respect to the defendant. *Miller,* 679 A.2d at 873.

## D

### The Standard of Review as to the Motion for a New Trial

In reviewing a trial justice's determination as to whether or not to grant a motion for a new trial, "we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *State v. Texieira,* 944 A.2d 132, 140–41 (R.I.2008); *see also State v. Woods,* 936 A.2d 195, 197 (R.I.2007); *Imbruglia,* 913 A.2d at 1028. We have consistently held that this Court "will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *Texieira,* 944 A.2d at 141 (internal quotation marks omitted); *see also State v. Bolduc,* 822 A.2d 184, 187 (R.I.2003). We employ this deferential standard of review due to the fact that "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Texieira,* 944 A.2d at 141. Further, at the appellate review level, the party challenging the trial justice's decision "bears the burden of convincing this [C]ourt that the trial justice did not conscientiously apply these standards." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994); *see also State v. DaRocha,* 121 R.I. 182, 185, 397 A.2d 500, 502 (1979).

## III

### Analysis

### A

### The Jury Instructions

The defendant challenges the trial justice's refusal to include in his jury instructions the specific language that defense counsel had requested concerning the "force or coercion" element that is an integral part of the felony of first-degree sexu-

al assault.[6] Specifically, defendant requested that the jury be instructed, in relevant part, as follows: "At a minimum, the alleged victim must demonstrate her lack of consent before the act occurs and then must offer such resistance as is reasonable under all the circumstances."

■■■■ This Court has held that a trial justice must "instruct the jury on the law to be applied to the issues raised by the parties." *State v. Lynch*, 770 A.2d 840, 846 (R.I.2001); *see also Palmer*, 962 A.2d at 764; *Imbruglia*, 913 A.2d at 1030; *see generally* G.L.1956 § 8–2–38. While a defendant may request that the trial justice include particular language in the jury instructions, the trial justice is not required to use any specific words or phrases when instructing the jury—so long as the instructions actually given "adequately cover the law * * *." *Palmer*, 962 A.2d at 764, 769; *see also Imbruglia*, 913 A.2d at 1030; *State v. Ensey*, 881 A.2d 81, 95 (R.I.2005).

■■■ Although he did not adopt the specific language that defendant requested be used in instructing the jury on the "force or coercion" element of the first-degree sexual assault charge, it is our opinion that the trial justice adequately and accurately instructed the jury as to that element of the charge. The trial justice stated, in relevant part:

"Force or coercion in this context means that the accused—in this case, obviously the defendant—overcomes—in this case, [Stephanie]—through the application of physical force or violence. The law does not expect the complaining witness—in this case [Stephanie]—as part of the State's proof of the use of physical force or coercion to engage in heroic resistance when such behavior could be fruitless or foolhardy."

After scrutinizing the just-quoted sentences, it is our opinion that the trial justice's jury instructions relative to the element of "force or coercion" were adequate. Although the term "lack of consent" is not explicitly utilized, the just-quoted portion of the instructions does employ the verb "overcomes"—which, when one reads the instructions in their entirety, can only mean that, as a precondition to a guilty verdict, the factfinder must find a lack of consent. *See State v. Goodreau*, 560 A.2d 318, 322 (R.I.1989) (stating that, in order to satisfy the "force of coercion" element of first-degree sexual assault, "the prosecution must merely show that the victim did not consent to the act"); *State v. Pignolet*, 465 A.2d 176, 184 (R.I.1983) (holding that the evidence was sufficient to establish that the "sexual activity was 'by force or coercion' rather than by consent" and that the victim "was 'overcome' by [defendant's] advances and that she did not consent willingly to his advances"). We perceive neither error nor prejudice to defendant in the trial justice's decision to decline defendant's request that the specific language that he preferred be included in the jury instructions.[7]

---

6. General Laws 1956 § 11–37–2 provides, in pertinent part, as follows:

"A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist:
"* * *
"(2) The accused uses force or coercion."

7. The defendant also contends that, pursuant to Rule 30 of the Superior Court Rules of Criminal Procedure and our decision in *State v. Coningford*, 901 A.2d 623, 629–30 (R.I. 2006), the trial justice should not have refused to include defendant's requested instructions solely for the reason that defense counsel did not provide the trial justice with the proposed instructions in writing before he instructed the jury. While we note that the

## B

## The Read–Back of Testimony

■ The defendant also contends that the trial justice erred in permitting the court reporter to read to the deliberating jury as extensively as she did from her notes relative to Stephanie's trial testimony. Specifically, defendant challenges the trial justice's decision to allow the read-back to continue (over defendant's objection) into an area concerning which the jury had not requested a read-back. The defendant points out that, whereas the jury had requested a read-back of Stephanie's testimony as to "exactly what happened when she and Kevin were on the couch," the actual read-back of Stephanie's direct testimony continued past the point in time when she was on the couch at the Adefusika home; the testimony that was read back included Stephanie's account of her running from the couch, grabbing a phone, barricading herself in a closet-like room, and calling her mother. The read-back also included Stephanie's direct testimony that defendant had threatened that "he was going to hunt [her] down and rape [her]."

The trial justice stated that, after receiving the jury's request for a read-back, he had "asked the court reporter to locate that testimony;" and he also conferred with the attorneys regarding the jury's request. The trial justice then explained to the jury that the court reporter would need to print and proofread her notes before reading Stephanie's testimony back to the jury. The trial justice also noted that "neither attorney objected to the reading

back of the testimony." He then excused the jury until the following Monday morning. On that Monday morning, the trial justice noted on the record that, before the court reporter actually started to read back Stephanie's testimony, he had attempted to contact defense counsel so that he "could go over what was to be read back." However, the trial justice was unable to reach defense counsel, and he permitted the court reporter to read to the jury an excerpted portion of Stephanie's testimony.

■ When a jury makes a request, the trial justice should, if the trial justice deems the request appropriate, conform his or her response to the request. *Ros,* 973 A.2d at 1176; *see also Dumas,* 835 A.2d at 443. The trial justice has considerable discretion as to how to respond to such a request. *Dumas,* 835 A.2d at 443–45; *see also Ros,* 973 A.2d at 1176. We perceive no abuse of discretion on the part of the trial justice or prejudice to defendant in this case. The trial justice permitted the court reporter to read portions of Stephanie's direct testimony, as well as defense counsel's cross-examination of her. Accordingly, the read-back was neither one-sided nor slanted in favor of either party. And, in any event, it simply consisted of testimony that the jury had already heard at trial; as such, it could be considered cumulative. *See Graham,* 941 A.2d at 860 n. 11.

In conclusion, it is our opinion that the read-back of Stephanie's testimony was fair and impartial and that the trial justice did not abuse his discretion in allowing it.

trial justice expressed his impatience with defense counsel in that regard, we need not reach the issue of whether the trial justice erred in refusing to give defendant's proposed instructions because he was irked with the timing of defendant's proffering of his suggested instructions—since we have concluded

that the instructions actually given adequately advised the jurors of the relevant legal principle. *See State v. Palmer,* 962 A.2d 758, 769 (R.I.2009); *see also State v. Imbruglia,* 913 A.2d 1022, 1030 (R.I.2007); *State v. Ensey,* 881 A.2d 81, 95 (R.I.2005).

*See Pierce,* 689 A.2d at 1035; *see also Ros,* 973 A.2d at 1176.

## C

### The Challenged Rebuttal Testimony

■ The defendant further challenges the admission of the rebuttal testimony of Officer Christopher Peloso (concerning his early-morning conversations with Lisa and Victoria several hours after the alleged assault). The defendant contends that such testimony was impermissible—since, in defendant's view, it constituted bolstering or vouching.[8]

When one witness offers an opinion "concerning the truthfulness of the testimony of another witness," such testimony is considered impermissible.[9]

■ It should be remembered, however, that this Court has consistently held that, "pursuant to our 'raise-or-waive' rule, we do not consider issues at the appellate level which have not been properly presented to the trial court." *State v. Diefenderfer,* 970 A.2d 12, 30 (R.I.2009); *see State v. Bido,* 941 A.2d 822, 828–29 (R.I.2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court."); *see also Palmer,* 962 A.2d at 766; *State v. Merida,* 960 A.2d 228, 236 (R.I.2008); *State v. Forand,* 958 A.2d

134, 141 (R.I.2008). Under the raise-or-waive rule, in order to preserve an objection for appellate review, an evidentiary objection must be "sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *." *State v. Warren,* 624 A.2d 841, 842 (R.I.1993); *see also Diefenderfer,* 970 A.2d at 30; *State v. Gautier,* 950 A.2d 400, 407 (R.I.2008).

In the instant case, during Officer Peloso's direct testimony as a rebuttal witness, defense counsel made one general objection and two motions to strike, none of which made reference to bolstering or vouching. Defense counsel then cross-examined Officer Peloso. On redirect, defense counsel made an additional motion to strike Officer Peloso's answer as nonresponsive. However, defense counsel did not articulate with reasonable specificity[10] the grounds for either his objection or his motions to strike Officer Peloso's direct rebuttal testimony, and the record reflects no mention of impermissible bolstering or vouching at trial. It is thus our opinion that an objection to that testimony as constituting bolstering or vouching was not preserved for appellate review. Accordingly, pursuant to our well-established raise-or-waive rule, defendant's argument relative to Officer Peloso's rebuttal testimony will not be considered by us. *See Diefenderfer,* 970 A.2d at 30; *see also*

---

8. The defendant's brief contends that the rebuttal testimony of Officer Peloso constituted bolstering or vouching. Those words are most frequently used in reference to testimony that is *supportive* of the testimony of one or more other witnesses. *See, e.g., State v. Chakouian,* 537 A.2d 409, 412 (R.I.1988); *State v. Brash,* 512 A.2d 1375, 1378–81 (R.I.1986). Nevertheless, it is clear to us that the defendant in this case is using those words to describe the prosecution's attempt (through the testimony of Officer Peloso) to minimize or undercut the testimony of Lisa and Victoria.

9. *See State v. Brown,* 709 A.2d 465, 479 (R.I. 1998); *see generally State v. Hazard,* 797 A.2d 448, 470 (R.I.2002).

10. *See Waterman v. Caprio,* 983 A.2d 841, 848 (R.I.2009) ("[T]his Court will not consider issues that were not preserved by sufficiently focusing the trial justice's attention on the matter."); *see also State v. Wiggins,* 919 A.2d 987, 990 (R.I.2007); *State v. Ibrahim,* 862 A.2d 787, 797 (R.I.2004).

*Bido*, 941 A.2d at 828–29.[11]

## D

### The Motion for a New Trial

Lastly, defendant challenges the trial justice's denial of his motion for a new trial. The defendant attacks the credibility of the prosecution's case, contending that it is impossible for "any rational judge of credibility" to believe the entirely uncorroborated testimony of Stephanie beyond a reasonable doubt.

When ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *Banach*, 648 A.2d at 1367; *see also Texieira*, 944 A.2d at 140; *Imbruglia*, 913 A.2d at 1028; *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *State v. Hallenbeck*, 878 A.2d 992, 1011 (R.I.2005). We review the rulings of trial justices on motions for a new trial deferentially "because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Texieira*, 944 A.2d at 141.

When passing upon a motion for a new trial, the trial justice must complete an analytical process comprised of at least three steps. *See DeOliveira*, 972 A.2d at 665; *see also State v. Rivera*, 839 A.2d 497, 502–03 (R.I.2003); *Banach*, 648 A.2d at 1367. The trial justice must: (1) "consider the evidence in light of the jury charge;" (2) then "independently assess the credibility of the witnesses and the

weight of the evidence;" and (3) determine whether or not he or she would have come to the same conclusion as that of the jury. *Morales*, 895 A.2d at 121. If the trial justice determines that he or she would have come to the same conclusion as that of the jury, "the analysis is complete and the verdict should be affirmed." *Rivera*, 839 A.2d at 503.

If the trial justice does not agree with the jury's verdict, he or she undertakes a fourth step in the analytical process, which has been described as follows:

"[The trial justice] must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted. However, the motion will be denied if the trial justice determines that the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ." *Id.*[12]

In passing upon Mr. Adefusika's motion for a new trial, it is clear that the trial justice conducted the required analyses, considered the evidence proffered at trial, and weighed the relative credibility of the several witnesses in light of his charge to the jury. Although the defendant challenged Stephanie's credibility on several fronts, the trial justice significantly found Stephanie to be "a very forthright witness," and he found her testimony to be "credible and believable." In contrast, the trial justice found the testimony of Lisa and Victoria to be "perjurious," and he said that their testimony "did [the defen-

---

11. It is true that this Court has recognized "a narrow exception" to the raise-or-waive rule. *See State v. DeOliveira*, 972 A.2d 653, 660 n. 6 (R.I.2009). However, the instant case does not meet the criteria that must be met for that narrow exception to be applicable. *See id.*

12. *See also DeOliveira*, 972 A.2d at 665; *Imbruglia*, 913 A.2d at 1028; *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994).

dant's] case a great deal of harm \* \* \*." In his concluding remarks, the trial justice stated that, in light of the evidence, "the jury was justified in returning the verdict of guilty." The trial justice therefore denied the defendant's motion for a new trial. Upon review, we are unable to conclude that, in denying that motion, the trial justice committed clear error or that he overlooked or misconceived material evidence relating to a critical issue in this case. *See Texieira,* 944 A.2d at 141.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record may be remanded to that tribunal.