**Supreme Court**

No. 2009-381-C.A.
(K1/07-254A)

State                           :

v.                              :

Jeffrey Martin.                 :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

Jeffrey Martin.                :

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**   The defendant, Jeffrey Martin, appeals from a

judgment of conviction for first-degree sexual assault following a jury trial in the Superior Court.

On appeal, the defendant argues that the trial justice erred in denying his request to instruct the

jury on the defense of consent, in admitting certain testimony under the excited-utterance

exception to the hearsay rule, and in denying his motion to dismiss the indictment because of

irregularities in the grand jury proceedings.   For the reasons set forth in this opinion, we affirm

the judgment of the Superior Court.

**I**

**Facts and Travel**

The July 8, 2006 sequence of events underlying this appeal began at a Hooters restaurant

in the City of Warwick where defendant went to watch a pay-per-view Ultimate Fighting

Championship match.   While there, defendant met Samantha,[1] who was also watching the fight.

The two engaged in conversation throughout the evening, and exchanged contact information.

The next day, defendant contacted Samantha, and they made plans to meet later that day at

Iggy's restaurant in Warwick.   They drove separately to Iggy's and ate lunch together.   After

---

[1] We shall use a pseudonym to refer to the complaining witness throughout this opinion.

lunch, they had drinks at the nearby Sandbar, and then decided to go to Kartabar in Providence. The two drove to Providence together in Samantha's car. Samantha testified that on their way to Kartabar, they stopped at an ATM as well as at defendant's apartment, where defendant spent a short time showing her around. The defendant testified differently: he said that although they stopped at an ATM on their way to Kartabar, it was not until after they left Kartabar that they visited his apartment. Both defendant and Samantha testified that they spent time together at Kartabar that afternoon.

From there, the testimony of Samantha and defendant diverges substantially. Samantha testified that, as she was driving defendant back to where his vehicle was parked in Warwick, he repeatedly asked if he could see her apartment but that she declined each of those requests. According to Samantha, defendant persisted, asserting that he needed to use the bathroom. Samantha testified that, because she did not know of a public restroom in the immediate vicinity, she relented and let him use the bathroom in her apartment, which was nearby. After defendant used her bathroom, Samantha showed him her apartment, including her pet ferrets, which she kept in a cage in her bedroom. Samantha testified that, after she put the ferrets away, she and defendant started to kiss, and defendant pushed her onto the bed, where they continued kissing. She also testified that, at some point, "defendant tried to move his hand underneath [her] shirt up towards [her] bra" and then "tried to move underneath the bra" on her right side; she added that she "said no, and [she] was able to free [her] right hand and grab his and pull it down." Samantha asserted that defendant then tried to remove her shorts, to which she responded, "No, Jeff, stop." She testified that by this point she had stopped kissing defendant, but that he was still trying to kiss her, and that he began to remove his own pants. Although she continued to tell defendant "no" and tried to push him away, defendant took her hand and placed it on his erect

penis. Samantha testified that, after she forcefully removed her hand from defendant's penis, he "inserted his fingers into [her] vagina," where they remained "for a few seconds." She recounted that she "yelled no and was able to move [her] hand down and grab his hand to remove [his fingers]" and that, when she tried to push him away, "[h]e grabbed [her] around the neck" and choked her. Samantha testified that this struggle continued and that defendant eventually "tr[ied] to insert his penis into [her]." According to Samantha, defendant continued in these attempts for a few minutes despite her continued protests, but was unsuccessful because she was still wearing shorts and the bottom half of a two-piece swimsuit.

Samantha testified that, after various attempts, she was finally able to push defendant away and get up from the bed, at which point she yelled at defendant to get dressed. The defendant eventually got dressed and Samantha drove him back to where his car was parked. She explained that she behaved calmly because "[she] didn't want to set the defendant off. [She] wanted to keep the cool demeanor that he seemed to have at the time and just get him back to his car and get away from him at that point." She testified that, when defendant asked if they could see each other again, she responded "maybe" (again, because she did not want to anger him) and that defendant kissed her before exiting her car, but that she did not reciprocate. Samantha recalled that she took a circuitous route back to her apartment and attempted to call four friends while en route, including Dawn Benson, who called her back approximately thirty minutes later.

The defendant recalled the events of July 9, 2006, very differently. The defendant testified that when they drove past Samantha's apartment, he asked if they could "check it out" and Samantha agreed to show him. She gave him a tour and showed him her pet ferrets in her bedroom. The defendant testified that, while they were in her bedroom, he noticed a laundry basket full of lingerie and that, when he asked her if she would ever wear it for him, she

- 3 -

responded, "maybe I will." He testified that they sat down on the bed together, where they started kissing and "caressing each other." The defendant recounted that he rubbed Samantha's breasts both on top of and beneath her shirt, and that she was making "sounds of pleasure." He also testified that he "lifted up her shirt and * * * was kissing her breasts," and that they started "massaging" each other in the "crotch area." However, defendant recounted that, when he started to unbutton his pants, Samantha told him, "No sex on the first date," to which he responded, "I know," and "went back to kissing her breasts." The defendant testified that he did not at any time pin or throw Samantha to the bed, and that he neither penetrated her with his finger nor attempted to have sex with her. Additionally, the defendant testified that he was not aroused at any point during the interaction, that he never had his pants or underwear off, and that the only time Samantha said "no" was with reference to not having sex on a first date. The defendant asserted that, eventually, the two were interrupted by sounds coming from the ferret cage and that, after Samantha got up to tend to the ferrets, defendant used the bathroom and then they left the apartment. The defendant recounted that he flirted with and touched Samantha as she was driving him back to his car and that he "was planning on kissing her, but she * * * beat [him] to the punch," by initiating a goodbye kiss.

Samantha also testified that two days later, she received two text messages from defendant, which read "Morning" and "How is your day going?" Additionally, she testified that she received two voicemail messages from defendant, but that they had been erased approximately one year after the incident. Samantha indicated that she told law-enforcement officials about the text and voicemail messages, but was not asked to save or copy them.

On July 13, 2006, Samantha contacted the police to make a complaint. She explained that she delayed in reporting the incident because "[she] felt very lucky to have gotten away from

the defendant and [she] thought that [she] could easily forget the situation as soon as [she] got away from him," but that "[e]very day got worse to the point where [she] wasn't eating, wasn't drinking, and had trouble sleeping." Both Samantha and defendant gave statements to the police.

In May 2007, the Kent County Grand Jury returned an indictment charging defendant with one count of first-degree sexual assault (digital-vaginal penetration) and one count of assault with intent to commit first-degree sexual assault (penile-vaginal penetration). The defendant moved to dismiss the indictment because of irregularities at the grand jury proceeding and because the prosecutor failed to present the grand jury with exculpatory evidence. In a written order issued in February 2007, a Superior Court justice denied defendant's motion to dismiss, noting that there is no requirement that a prosecutor present exculpatory evidence to the grand jury and concluding that the state did not commit such flagrant prosecutorial misconduct as to warrant dismissing the indictment.

In June 2009, the case proceeded to trial. The jury heard the testimony of Samantha and defendant, described supra. Additionally, Ms. Benson testified about the telephone conversation she had with Samantha shortly after the events had transpired. Specifically, Ms. Benson testified that Samantha was "upset" during the call, that her tone of voice sounded different from how it normally sounded, that Ms. Benson "just could tell" that Samantha "wasn't herself," and that Samantha "just kept saying the same thing over and over again." Ms. Benson recalled that Samantha told her that, after she had lunch with defendant, they went to Samantha's apartment where defendant "threw her down on the bed" even though "she said no repeatedly to his advances." Additionally, Ms. Benson testified that Samantha conveyed that, after defendant "threw her on the bed, he penetrated her with his finger." The defendant objected to the introduction of Ms. Benson's testimony, arguing that it was hearsay to which the excited-

- 5 -

utterance exception did not apply, it was unduly prejudicial, and it served only to impermissibly corroborate Samantha's own testimony.[2] The trial justice overruled defendant's objection, noting that the conversation between Samantha and Ms. Benson took place shortly after the traumatic event and that "it [wa]s quite clear that [Samantha] was still operating under an emotional state," as indicated by the substantial trauma that she testified she had experienced, her various attempts to call friends for advice and support, and Ms. Benson's observation that Samantha sounded upset.

At the conclusion of evidence, defendant requested that the trial justice instruct the jury on the defense of consent and on mistake of fact as to consent. Specifically, defendant argued that the jury could conclude, based on the evidence presented, that the alleged penetration occurred, but that Samantha had consented to it, or that defendant had made a reasonable mistake of fact as to her consent. However, the trial justice concluded that consent was not at issue in this case because, based on the testimony given, the assault either took place or it did not and that, therefore, a consent instruction would only invite the jury to speculate as to other scenarios that may have occurred. Therefore, the court rejected defendant's proposed consent instruction.

The jury returned a guilty verdict on count 1 (digital-vaginal penetration) and a not-guilty verdict on count 2 (assault with intent to commit penile-vaginal penetration). The defendant moved for a new trial, which the trial justice denied, concluding that Samantha was credible, defendant was not credible, and a consent instruction was not warranted because no evidence was presented at trial to support a consent theory. A judgment of conviction entered on August 21, 2009, and defendant timely appealed.

---

[2] Although defendant argued in his written submissions to this Court that Ms. Benson's testimony amounted to impermissible "bolstering," he acknowledged at oral arguments before this Court that "corroborating" might be a more appropriate term.

## II

## Discussion

The defendant raises three issues on appeal. First, defendant argues that the trial justice erred in refusing to instruct the jury on a consent defense. Secondly, defendant asserts that the trial justice erred in admitting Ms. Benson's hearsay testimony. Finally, defendant avers that the trial justice erred in denying his motion to dismiss the indictment. We address each of these arguments in turn.

## A

## Jury Instructions

The trial justice instructed the jury that, to find defendant guilty on count 1, it needed to find that digital-vaginal penetration occurred, that such penetration was for the purpose of sexual arousal or gratification, and that defendant accomplished the penetration "by means of force or coercion." The trial justice explained that

> "Force or coercion means overcoming the complainant through the application of physical force or violence against her will. The element of force or coercion requires that the State prove that the defendant used force or violence before the penetration occurred. The degree of force must be more than the force necessary to accomplish the act of penetration."

Additionally, the jury was instructed that, as to Samantha's resistance, the state was required to prove that "[she] offered such resistance, if any, as seems reasonable under the circumstances." The defendant requested that the trial justice also instruct the jury that as to count 1,

> "In order to find the defendant guilty, the State must prove beyond a reasonable doubt that [Samantha] * * * did not consent to the first degree sexual assault of digital/vaginal penetration. The defendant does not have the burden of proving the defense of consent. It is the State's burden to negate it beyond a reasonable doubt. A woman must offer such resistance as seems reasonable under all the circumstances."

The trial justice denied defendant's request, and on appeal defendant argues that this amounts to reversible error "because the evidence as a whole had created a factual basis from which the jury could have properly found consent and acquitted [defendant]." The state responds that, because there was no testimony to support a consent theory in this case, the jury could have reached defendant's conclusion only through negative inferences, which are, by themselves, insufficient to support a jury charge.

"We undergo a review of jury instructions on a de novo basis." State v. Lopez, 45 A.3d 1, 22 (R.I. 2012) (quoting State v. Cipriano, 21 A.3d 408, 423 (R.I. 2011)). It is well settled that this Court "review[s] '[jury] instructions in their entirety,'" and "we will affirm if 'the instructions adequately cover the law and neither reduce nor shift the state's burden of proof.'" Id. (quoting Cipriano, 21 A.3d at 423). Moreover, we review jury instructions "to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and we review challenged portions of jury instructions in the context in which they were rendered." State v. Adefusika, 989 A.2d 467, 475 (R.I. 2010) (quoting State v. John, 881 A.2d 920, 929 (R.I. 2005)). "As long as the trial justice's general charge has fairly covered a requested charge for jury instructions, his refusal to grant the requested charge is not reversible error." State v. Linde, 876 A.2d 1115, 1128-29 (R.I. 2005) (quoting State v. Turner, 746 A.2d 700, 703 (R.I. 2000)).

General Laws 1956 § 11-37-2(2) provides that "[a] person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if * * * [t]he accused uses force or coercion." Section 11-37-1(2)(ii) provides that "[f]orce or coercion" occurs "when the accused * * * [o]vercomes the victim through the application of physical force or physical violence." We have held that "[i]t is the state's burden to prove lack of consent beyond a

reasonable doubt." State v. Lynch, 19 A.3d 51, 60 (R.I. 2011). However, we have also indicated that lack of consent is not an element of the offense, but rather consent is a defense to the crime, id.; and thus, we have held that, when a jury charge adequately covers the "force or coercion" element, a separate instruction on consent is unnecessary. See Adefusika, 989 A.2d at 477. For example, in Adefusika, 989 A.2d at 471, 472, the complaining witness testified that the defendant pinned her down on a couch and digitally penetrated her vagina. The defendant was charged with first-degree sexual assault, and the trial justice instructed the jury on the "force or coercion" element as follows:

> "Force or coercion in this context means that the accused * * *
> overcomes * * * [the complaining witness] * * * through the
> application of physical force or violence. The law does not expect
> the complaining witness * * * as part of the State's proof of the use
> of physical force or coercion to engage in heroic resistance when
> such behavior could be fruitless or foolhardy." Id. at 477.

The defendant in that case requested that the jury also be instructed that, "[a]t a minimum, the alleged victim must demonstrate her lack of consent before the act occurs and then must offer such resistance as is reasonable under all the circumstances," but the trial justice refused to give that charge. Id. at 476, 477. We affirmed the trial justice's decision to not instruct on lack of consent and concluded that the instruction given was "adequate" because "[a]lthough the term 'lack of consent' [wa]s not explicitly utilized, the * * * quoted portion of the instructions d[id] employ the verb 'overcomes'—which, when one reads the instructions in their entirety, can only mean that, as a precondition to a guilty verdict, the fact-finder must find a lack of consent." Id. at 477. We perceive Adefusika to be on all fours with the case at bar. In particular, we note that, as in Adefusika, 989 A.2d at 477, the jury instructions here provided that "[f]orce or coercion means overcoming the complainant through the application of physical force or violence against her will." (Emphasis added.) We are of the opinion that this instruction adequately conveyed to

- 9 -

the jury that, to find defendant guilty of first-degree sexual assault, it also needed to conclude that Samantha did not consent to the penetration.

Moreover, we reject defendant's contention that the evidence presented at trial supported his consent theory. In particular, we observe that neither Samantha's testimony nor defendant's testimony supports a version of events in which the alleged penetration took place, but with Samantha's consent: on one hand, Samantha testified to digital penetration against her will, after a struggle and numerous protests; on the other hand, defendant testified that the alleged penetration simply did not occur. In the context of self-defense, we have held that a trial justice is obligated to give a proposed instruction on self-defense "regardless of how 'slight and tenuous the evidence may be on which the self-defense hypothesis is advanced.'" Linde, 876 A.2d at 1130 (quoting State v. Butler, 107 R.I. 489, 496, 268 A.2d 433, 436 (1970)). However, for a defense instruction to be warranted, "the record as a whole must contain at least a scintilla of evidence supporting the defendant's theory," and we have affirmed a trial justice's refusal to give a proposed instruction where there was an "incongruent self-defense theory proffered by [the defendant] to the trial justice and [a] dearth of evidence applicable to a properly articulated theory." State v. Pineda, 13 A.3d 623, 634 (R.I. 2011). In fact, we have cautioned that an instruction that is unsupported by the evidence adduced at trial runs the risk of confusing or misleading the jury and thus should not be given. State v. DiChristofaro, 848 A.2d 1127, 1130 (R.I. 2004). Applying these concepts to the case at bar, we conclude that the trial justice did not err in refusing to instruct the jury on a consent defense that was unsupported by any of the testimony given at trial. We hold, therefore, that given the evidence presented here, the jury instructions given in this case adequately apprised the jury of the operative legal concepts that were in play.

## B

## Ms. Benson's Testimony

The defendant next argues that the trial justice erred in admitting Ms. Benson's testimony regarding the telephone conversation she had with Samantha shortly after the events in question. In particular, defendant maintains that Ms. Benson's testimony was inadmissible hearsay that did not fall within the exited-utterance exception of Rule 803(2) of the Rhode Island Rules of Evidence because Ms. Benson could not adequately perceive Samantha's demeanor over the telephone and, further, because prior to the conversation Samantha had the time and opportunity "to collect [her] thoughts." Additionally, defendant maintains that introduction of Ms. Benson's testimony was not harmless error, but rather improperly corroborated or bolstered Samantha's testimony because "[t]he jury was permitted to hear [Samantha's] story twice while only hearing Mr. Martin's once and, as such, there was a very real possibility that Ms. Benson's testimony improperly influenced the jury's verdict." The state responds that the trial justice did not abuse his discretion in concluding that Samantha's conversation with Ms. Benson fell within the excited-utterance exception because the conversation took place less than an hour after the alleged assault, Samantha's own conduct indicated that she was still operating under the stress of the event, and Ms. Benson testified that Samantha seemed upset during their conversation. Additionally, the state contends that Ms. Benson's testimony does not amount to impermissible bolstering because she merely recounted what Samantha had told her, without commenting on Samantha's credibility or veracity.

Hearsay is defined in Rule 801(c) of the Rhode Island Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pursuant to Rule 802 of the Rhode Island Rules of

Evidence, hearsay statements are inadmissible except as provided by law. "[A] determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island, 996 A.2d 684, 692 (R.I. 2010). "Under this standard, a trial justice's ruling will be upheld unless abuse of discretion that prejudices the complaining party is shown." State v. Brown, 9 A.3d 1240, 1247 (R.I. 2010).

One exception to the hearsay exclusion is for excited utterances, which Rule 803(2) defines as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "The rationale behind the excited utterance exception is that 'a startling event may produce an effect that temporarily stills the declarant's capacity of reflection and produces statements free of conscious fabrication.'" State v. Oliveira, 961 A.2d 299, 314 (R.I. 2008) (quoting State v. Torres, 787 A.2d 1214, 1222 (R.I. 2002)). Thus, "[t]he test is whether, from a consideration of all the facts, the declarant 'was still laboring under the stress of excitement caused by the event when he or she made the statement at issue.'" Id. at 315 (quoting State v. Morales, 895 A.2d 114, 120 (R.I. 2006)). However, the "statement need not have been 'strictly contemporaneous with the startling event'" to qualify as an excited utterance, id. (quoting State v. Momplaisir, 815 A.2d 65, 70 (R.I. 2003)), and we have repeatedly held that "[t]he time requirement is more lenient in sexual assault cases under the reasoning that 'the shock of the event often lasts longer and the outpouring may come only later, when a parent, friend, or officer is present.'" Id. (quoting Morales, 895 A.2d at 120).

Here, the trial justice concluded that, although hearsay, Ms. Benson's testimony regarding what Samantha told her was nonetheless admissible as an excited utterance because it had all the hallmarks of having been made under the stress of a traumatic event. In particular,

- 12 -

the trial justice explained that Ms. Benson and Samantha had been close friends for several years, the two maintained frequent telephone contact, and Ms. Benson described Samantha's tone of voice as sounding "upset" and as though "she wasn't herself." He also noted that, by her own testimony, Samantha was quite traumatized by the events of the day, as evidenced by the facts that she attempted to quickly remove defendant from her home, took a circuitous route back to her apartment so that defendant would not follow her, and tried to contact four friends for advice and support, all of which indicated that Samantha was still operating under the stress of the event at the time she spoke with Ms. Benson. Additionally, he found that the trial testimony indicated that the conversation between Samantha and Ms. Benson took place within an hour of the traumatic events. Finally, the trial justice noted that Samantha waited several days before filing a police report because she thought she would be able to forget about the events of that day, but was ultimately unsuccessful in doing so, suggesting "that there was a lingering emotion[al] trauma associated with the sexual assault." Thus, the trial justice concluded that, based on the totality of the circumstances, Samantha's statement to Ms. Benson was made while she was still laboring under the stress of the traumatic event and before she had the opportunity to invent or misrepresent facts.

We observe that, in addition to the factors noted by the trial justice, Ms. Benson testified that, during the telephone conversation, Samantha "just kept saying the same thing over and over again," further suggesting that Samantha was in an excited state at that point. Moreover, Samantha's testimony indicated that Ms. Benson was the first person she talked to following the event. Cf. State v. Burgess, 465 A.2d 204, 207 (R.I. 1983) (holding that the complainant's statement to a physician regarding a sexual assault was not an excited utterance when it was made nearly three hours after the assault, the complainant had already talked with three other

people about the assault, and the physician merely described the complainant as "emotionally upset" at the time she made the statement). We are satisfied that, based on these factors, the trial justice could have reasonably concluded that Samantha was still operating under the stress of the event and that, therefore, he did not abuse his discretion in admitting Ms. Benson's testimony under the excited- utterance exception to the hearsay rule.

Finally, we reject defendant's argument that Ms. Benson's testimony amounted to impermissible bolstering or improper corroborating. "Impermissible 'bolstering' or 'vouching' typically occurs when one witness 'offer[s] an opinion regarding the truthfulness or accuracy of another witness'[s] testimony.'" State v. Arroyo, 844 A.2d 163, 169 (R.I. 2004) (quoting State v. Lassiter, 836 A.2d 1096, 1107 (R.I. 2003)). However, it may also "occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony," but rather, where "one witness's testimony has the same substantive import as if it addressed another witness's credibility, it is inadmissible." Id. (quoting Lassiter, 836 A.2d at 1107). For example, in State v. Lynch, 854 A.2d 1022 (R.I. 2004), we held that a school psychologist's testimony about what a sexual-assault victim told her did not amount to impermissible vouching because the psychologist merely repeated the victim's own statements, id. at 1030, and "offered no opinion about their veracity or credibility." Id. at 1033. We also pointed out that the victim in that case testified at trial, giving the jury "the opportunity to hear the same story directly from [her]." Id. By contrast, in State v. Rushlow, 32 A.3d 892 (R.I. 2011), we held that, when a police officer testified regarding a conversation he had with a sexual-assault victim and described her as

"a little nervous, upset and sincere on the issue," id. at 898, the testimony "improperly bolstered [the victim's] credibility."[3] Id. at 899.

Here, Ms. Benson merely repeated what Samantha told her over the phone—that defendant "threw her on the bed, [and] he penetrated her with his finger" even though "she said no repeatedly to his advances"—and reported that during the conversation, Samantha was "upset" and "wasn't herself." Ms. Benson offered no opinion as to Samantha's veracity either at that moment or generally; she merely reiterated the same basic version of events about which Samantha herself testified.

We pause to emphasize that we apply a very deferential standard of review when evaluating a trial justice's evidentiary rulings, and while the admissibility of Ms. Benson's testimony may have been a close call, we nonetheless conclude that the trial justice did not abuse his discretion in admitting the testimony of Ms. Benson regarding her telephone conversation with Samantha about the events in question.

## C

### Irregularities at the Grand Jury Proceedings

The defendant next argues that the trial justice erred in declining to dismiss the grand jury indictment because of what he characterizes as a series of irregularities at the grand jury proceeding. In particular, defendant identifies two specific problems with the prosecutor's presentment to the grand jury, which he argues resulted in a due-process violation. First, defendant complains about grand jury testimony by Warwick Det. Kevin Petit regarding two controlled phone calls made by Samantha to defendant's alleged phone number, recordings of

---

[3] However, we also concluded in that case that the trial justice did not abuse her discretion in declining to pass the case after carefully instructing the jury to disregard the bolstering testimony. State v. Rushlow, 32 A.3d 892, 900 (R.I. 2011).

which have since been erased.[4]  In particular, defendant argues that the prosecutor should have presented exculpatory evidence to the grand jury—namely, defendant's cell-phone records indicating that no such calls were received.  Second, defendant argues that he was unduly prejudiced when Det. Petit testified incorrectly that a picture of defendant, which was used in a photo array presented to Samantha, had been obtained from the Warwick Police Department's arrested-persons records, when, in reality, the photo was obtained from the Division of Motor Vehicles.  The defendant argues that this error unduly prejudiced him before the grand jury, as evidenced by the fact that it prompted one of the grand jurors to ask about whether defendant had any prior sexual-assault arrests.

The state responds that none of the prosecutorial misconduct alleged here was so flagrant as to warrant dismissal of the indictment, and it argues that the prosecutor was under no duty to present exculpatory evidence at the grand jury proceeding.  Additionally, the state urges that, even if prosecutorial misconduct rendered the initial indictment defective, those defects are harmless error and were cured because defendant has since been tried before, and convicted by, a petit jury.

This Court has recognized that some fundamental flaws in the grand jury process, such as race and gender discrimination in the grand jury selection process, "require automatic dismissal of an indictment." State v. Russell, 950 A.2d 418, 428 n.7 (R.I. 2008).  However, we have also

---

[4] In his filings with this Court, defendant also takes issue with the fact that Det. Petit testified about the two text messages and two voicemail messages allegedly sent by defendant to Samantha following the events in question, which were not recorded by police even though Det. Petit knew about those messages when he testified before the grand jury.  However, defendant does not clearly indicate how or why testimony about those messages before the grand jury was prejudicial.  Additionally, at trial, defendant had the opportunity to, and did in fact, cross-examine Samantha about the text messages and voicemail messages, and he does not now complain about the introduction of this evidence at trial.  Therefore, we understand defendant's primary claim of error to be about the controlled phone calls, rather than the unrecorded text and voicemail messages.

- 16 -

"held that a trial on the merits renders harmless any defect that occurred in the grand jury process," id. at 428 (quoting State v. Mainelli, 543 A.2d 1311, 1313 (R.I. 1988)), because "[t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." Id. at 428 (quoting State v. Woodson, 551 A.2d 1187, 1191 (R.I. 1988)). Thus, we apply a harmless-error standard and will dismiss an indictment only if we determine that "there has been flagrant prosecutorial misconduct accompanied by severe and incurable prejudice." State v. Franco, 750 A.2d 415, 419 (R.I. 2000) (quoting State v. DiPrete, 710 A.2d 1266, 1276 (R.I. 1998)).

Here, the complained-of defects in the grand jury proceeding were not present at trial: there was no mention of the alleged controlled calls to the petit jury, and Det. Petit did not testify regarding the photo array. Nonetheless, the petit jury found the defendant guilty of one count of first-degree sexual assault. Thus, it is clear that, even without the irregularities present at the grand jury proceeding, "[t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendant[] w[as] guilty as charged, but also that [he was] in fact guilty as charged beyond a reasonable doubt." Russell, 950 A.2d at 428 (quoting Woodson, 551 A.2d at 1191). Additionally, we note that the prosecutorial misconduct alleged here does not rise to the level of systematically excluding grand jurors on the basis of race or gender, nor does it rise to the level of some other similarly egregious constitutional violation. See id. at 428 n.7. Therefore, we conclude that any error that may have occurred during the grand jury proceeding here was harmless, and we decline to disturb the trial justice's order denying the defendant's request to dismiss the indictment.

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record in this case may be remanded to the Superior Court.

Justice Indeglia did not participate.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       State v. Jeffrey Martin.

**CASE NO:**       No. 2009-381-C.A.
                            (K1/ 07-254A)

**COURT:**       Supreme Court

**DATE OPINION FILED:**   June 18, 2013

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**       Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Kent County Superior Court

**JUDGE FROM LOWER COURT**:

                            Associate Justice Edwin J. Gale

**ATTORNEYS ON APPEAL:**

                            For State:  Lauren S. Zurier
                                        Department of Attorney General

                            For Defendant:  Lara E. Montecalvo
                                        Office of the Public Defender